[No. S049389. May 6, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS HOWARD LENART, Defendant and Appellant.

---

## COUNSEL

Gregory Marshall, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Stan Cross and Susan Rankin Bunting, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**KENNARD, J.**—A jury convicted Thomas Howard Lenart of the first degree murder of Oberta Toney (Pen. Code, § 187)[1] and found true the special circumstance that the murder was committed in the course of, or flight after, a robbery (former § 190.2, subd. (a)(17)(i)). It also convicted him of the robbery of Toney (§ 211) and the attempted murder of Eleanor Gallardo (§§ 664 , 187), and it found that the attempted murder was willful, deliberate and premeditated. As to each of these crimes, the jury found that defendant had personally used a firearm. (§ 12022.5, subd. (a).) Lastly, the jury convicted defendant of being a convicted felon in possession of a firearm (§ 12021). After a court trial, defendant was found to have three prior convictions for serious felonies (§ 667, subd. (a)). At the penalty phase, the jury returned a verdict of death. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I. FACTS

### A. *Guilt Phase—Prosecution Case*

About noon on July 15, 1993, Eleanor Gallardo stopped at the Anderson Lounge in Anderson, Shasta County. After parking behind the building, she entered the bar through the back door. Almost immediately she was confronted by a man with a bundle under his arm and a gun in his hand who told her to get down on the floor. Gallardo started to comply, then turned and grabbed the gun with both hands, trying to point it away from herself. During the struggle, the gun fired. When the man took one hand off the gun in an effort to apply a choke hold to Gallardo, she managed to pull free and run out the front door, gun in hand. As she ran screaming down the street, she turned and saw that her assailant had followed her onto the sidewalk; she ran into a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

nearby hair salon, from which police were summoned. At the Anderson Lounge, officers discovered the body of bartender Oberta Toney in a small closet behind the bar where she was lying facedown, hands crossed under her chest.

Gallardo, who was unable to identify defendant at a lineup on July 22, testified at trial that the man accosted her shortly after she entered the dimly lit bar from the sunny parking lot. Once she saw the gun pointed at her, she focused her attention on it.

At trial, several witnesses who were in the bar on the morning of July 15, 1993, testified that defendant came into the bar between 9:30 and 10:00 a.m. Floyd White identified defendant and recognized defendant's yellow pickup because on an earlier occasion defendant had visited White's home to look at some tires White was selling. Denice Foster identified defendant as the man who sat next to her until she left the bar at noon. Thomas McBroome identified defendant as the man in the bar that morning drinking a bottle of Budweiser and introducing himself as "Tom." Police found defendant's fingerprint on a Budweiser bottle in the bar.

Bar co-owner Sharon Munns testified that on the morning of the crime the cash register contained about $1,800, including $1 bills in packets of 25 bills secured with rubber bands, and coins rolled in orange paper wrappers bearing the logo G.A.M.E. The bar's cashbox, kept behind the bar, had a check for $827.80 payable to a beer supplier, Foothill Distributors, as well as $2,000 in $100 bills that Toney, the bartender, had requested in order to cash paychecks for employees of a local business. Munns identified defendant as the man who sat next to her in the bar on that morning until she left at 11:44 a.m. When police arrived about 12:20 p.m., the cash register was empty and two bloodstained $100 bills were lying on the floor.

The gun Gallardo had wrested from her assailant was a .22-caliber Colt single-action revolver belonging to Dale Cutler, who had kept it in a toolbox in his barn. Sometime between July 5 and July 10, 1993, Cutler discovered the gun was missing. During June or July 1993, defendant had visited his former wife, who occupied a rental unit on Cutler's property, and in early July he had borrowed tools from Cutler.

Candida Kelly testified that in July 1993 defendant was putting a new roof on her house. She agreed to pay him for his labor with a used car and $150 in cash. On July 13 and 14, at his request, she gave him gas money. On July 15, she was at home, but defendant did not show up to work.

Karen Grabenstatter, with whom defendant was living in July 1993, testified that on the afternoon of July 15, 1993, defendant picked her up and

they drove to Viacom Cable and to Redding Utility. A receipt from Viacom showed payment to defendant's account was made in cash at 1:28 p.m. on the 15th. Defendant's landlord testified that defendant paid some $300 in past due rent that same afternoon between 4:00 and 4:30.

On July 21, 1993, the police executed a search warrant at defendant's apartment. On the kitchen floor they found a paper grocery bag containing coin wrappers, burnt fragments of the missing Anderson Lounge check, cigarette butts and ashes. The officers also retrieved a pair of tan cowboy boots from defendant's closet. Later testing found, under the metal toe band of one boot, some drops of human blood that were consistent with the blood of the murdered bartender, Toney.

On August 17, 1993, Grabenstatter discovered an unfamiliar Sentry strongbox in her storage shed and called police. The strongbox was identified by its owner Margaret Alcock, defendant's previous girlfriend, who had kept over $1,000 in it. When the box was in Alcock's possession, she kept some rolled pennies in it, but none of them were in orange G.A.M.E. wrappers like those on several of the 14 rolls of coins found in the box in August. At that time, the box also contained four bundles of twenty-five $1 bills, each bundle secured with a rubber band. In addition, the box had jewelry that Alcock identified as hers, as well as jewelry that she recognized as belonging to defendant.

Criminalist Carmel Suther, of the California Department of Justice laboratory, conducted electrophoretic testing of samples of blood spots found on the bar's back door handle. The blood on the door was consistent with defendant's blood.

Dr. Joseph Tripoli, former Shasta County Medical Examiner, who performed an autopsy on Toney, testified that horseshoe-shaped lacerations on the back of her head could have been caused by kicks from the pointed toe of a cowboy boot. Shasta County forensic pathologist Harold Harrison concluded that Toney was lying down when she was killed by two bullets fired into her head from a distance of two to four feet. While she was still alive, Toney received blunt force injuries on her head and defensive injuries on her arms.

### B. *Guilt Phase—Defense Case*

Defendant stipulated that he was a convicted felon, and the defense rested *without presenting evidence.*

### C. *Court Trial on Prior Convictions*

Before the penalty phase began, there was a court trial on allegations that defendant had been convicted of three prior serious felonies (§ 667, subd. (a)). The court found that defendant in July 1970 was convicted in Los Angeles County of robbery (§ 211), in October 1987 was convicted in San Bernardino County of grand theft of a firearm (§ 487), and in November 1987 was convicted in Shasta County of robbery (§ 211).

### D. *Penalty Phase—Prosecution Case*

The prosecution introduced evidence of prior criminal acts by defendant involving force or violence. (§ 190.3, subd. (b).)

William Davis, who in 1977 was a security guard for a Torrance grocery store, testified that while he and a partner were questioning defendant in a store interview room about a suspected shoplifting, defendant suddenly pointed a handgun at Davis's stomach. During the ensuing struggle, defendant fired one shot before Davis and his partner overpowered him. At the police station defendant threatened Davis, saying, "I'm going to kill you, motherfucker."

George Watford testified to a January 1987 incident at a bar in Cottonwood, where he was working as a janitor. Hearing a knock on the locked door about 4:00 a.m., Watford opened the door to discover defendant pointing a handgun at him. Defendant ordered Watford and a female employee onto the floor, told them to cover their eyes, and kicked Watford in the head and ribs with his cowboy boots. Threatening to kill Watford, defendant put his .45-caliber pistol close to Watford's head, and Watford heard the click of the hammer being cocked.

Two members of murder victim Oberta Toney's family, her daughter and her sister, testified as to the grief Toney's death caused them and her two young grandchildren.

A fingerprint expert testified that defendant's fingerprints matched those on documents from the Department of Corrections pertaining to two of defendant's prior convictions found true by the court.

### E. *Penalty Phase—Defense Case*

Lieutenant Clarence Finmand of the Anderson Police Department testified that when he had interviewed William Davis in 1994, Davis's 1994 account of what happened in the interview room in 1977 was slightly different from

his trial testimony. In the 1994 interview, Davis said the gun went off after he kneed defendant in the groin as he and his partner attempted to subdue defendant.

The sole evidence in mitigation offered by the defense was the testimony of Jack Stewart, a former felon currently associated with Eagles Soar, "a men's discipleship home." Called as an expert on prison life, Stewart testified that inmates learn to take what they need by force, not to reveal emotion lest they appear weak, and to join racially segregated prison gangs. Stewart mentioned the difficulty he had in getting a job because of his prison record.

## II. DENIAL OF DEFENDANT'S SUPPRESSION MOTION

At trial, the prosecution introduced fragments of a burnt check found in defendant's apartment and identified by bar owner Sharon Munns as a check that she had left in the bar cashbox.

On July 21, 1993, Sergeant Timothy York and Lieutenant Clarence Finmand of the Anderson Police Department searched defendant's apartment under a search warrant that authorized them to seize .22-caliber ammunition marked with the letter "F," faded blue pants, a red T-shirt, a red baseball cap, a holster for a .22-caliber revolver with a five-and-a-half-inch barrel, and bloodstained currency. During that search, the officers seized from the kitchen floor a brown paper grocery bag containing discarded coin roll wrappers and charred fragments of paper.

Before trial, defendant moved unsuccessfully under section 1538.5 to suppress the contents of the paper grocery bag, arguing that the warrant did not authorize seizure of the bag or its contents and that the bag's contents did not come within the exception for items in plain view because their incriminating character was not immediately apparent. On the same grounds, defendant again unsuccessfully sought to exclude evidence of the bag's contents at trial. He now argues that the trial court erroneously denied these motions.

■ Our review of issues related to the suppression of evidence seized by the police is governed by federal constitutional standards. (Cal. Const., art. I, § 28, subd. (d); *People v. Bradford* (1997) 15 Cal.4th 1229, 1291 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Although "the warrant clause of the Fourth Amendment [to the federal Constitution] provides that no warrant may issue except those 'particularly describing the place to be searched, and the persons or things to be seized,' " officers who search with a warrant "may seize items specifically named in a valid warrant, as well as other items in plain view." (*People v. Kraft* (2000) 23 Cal.4th 978, 1041 [99 Cal.Rptr.2d 1, 5 P.3d 68];

*Horton v. California* (1990) 496 U.S. 128, 136 [110 L.Ed.2d 112, 110 S.Ct. 2301].) Items in plain view, but not described in the warrant, may be seized when their incriminating character is immediately apparent. (*Horton v. California, supra,* at p. 136 .) The incriminating character of evidence in plain view is not immediately apparent if "some further search of the object" is required. (See *Minnesota v. Dickerson* (1993) 508 U.S. 366, 375 [124 L.Ed.2d 334, 113 S.Ct. 2130].)

■ In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. (*People v. Weaver* (2001) 26 Cal.4th 876, 924 [111 Cal.Rptr.2d 2, 29 P.3d 103].) We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment. (*Ibid.*)

At the hearing on the suppression motion, Lieutenant Finmand testified that while he was in the kitchen he noticed on the floor an open paper grocery bag in which he could see a "noticeable" quantity of ashes, fragments of unburned material, and "what appeared to be a crinkled up coin wrapper." Looking into the bag he saw paper fragments with "writing in numbers" "some type of a lined column" which he suspected might be "a check or some type of accounting document" of the sort normally kept in a cashbox like the one missing from the bar. When Finmand asked Sergeant York to look into the bag, York, who had been one of the first officers at the crime scene, pointed out the coin wrapper.

■ The defense argued that the officers' seizure of the paper grocery bag was impermissible because there was "no nexus" between the items they saw in the bag and items taken from the bar. The trial court denied the suppression motion, noting that Lieutenant Finmand (who eventually became the lead investigator on the case) knew the bar was "missing currency, coin wrappers, accounts" and "items related to retail business transactions commonly kept in a cash box." Given that knowledge, the officers' observations of a crumpled coin wrapper and burnt fragments of what appeared to be financial records in the open grocery bag made it immediately apparent to the officers, without additional examination, that these items might be discarded evidence of the robbery. (See *People v. Bradford, supra,* 15 Cal.4th at pp. 1295–1296.) The trial court did not err in denying defendant's motion to suppress.

### III. Denial of Defense Motion for Two Juries

Defendant sought empanelment of two juries—the first, not death qualified, to sit at the guilt phase of his capital trial, and the second, to be death

qualified, in the event a penalty phase was required. After a hearing, the court denied the motion without prejudice to its renewal at the conclusion of the guilt phase. Defendant did not renew the motion.

## A. *Denial of an Impartial Jury at the Guilt Phase*

■ Defendant contends the trial court violated his right to an impartial jury at the guilt phase (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16) by excluding for cause from the venire those jurors who would automatically vote against imposing death at the penalty phase. He acknowledges that the United States Supreme Court has rejected his claim under the federal Constitution. (*Lockhart v. McCree* (1986) 476 U.S. 162, 182–183 [90 L.Ed.2d 137, 106 S.Ct. 1758].) Nonetheless, he urges us to reach a different result on independent state grounds under the due process and jury trial protections offered by article I, sections 7, 15, and 16 of the California Constitution.

In *People v. Jackson* (1996) 13 Cal.4th 1164 [56 Cal.Rptr.2d 49, 920 P.2d 1254], we considered the "social science evidence" the defendant there offered to show "that death-qualified juries are more prone to convict than those not thus qualified," and we concluded that such evidence does not support a constitutional prohibition of death qualification. (*Id.* at pp. 1198–1199; see also *People v. Catlin* (2001) 26 Cal.4th 81, 112 [109 Cal.Rptr.2d 31, 26 P.3d 357] [state constitutional right to impartial jury not violated by exclusion of persons opposed to death penalty].) Defendant here concedes that his claim is "essentially the same claim" that was before us in *Jackson.* More recently, we rejected such a claim after concluding the "defendant presents no good reason to reconsider our ruling as to the California Constitution." (*People v. Steele* (2002) 27 Cal.4th 1230, 1243 [120 Cal.Rptr.2d 432, 47 P.3d 225].) Defendant here has likewise failed to make a compelling case for us to revisit this issue.

## B. *Claim Jury Did Not Represent a Fair Cross-section of the Community*

■ Defendant contends that California's jury selection process in capital cases, which requires the exclusion of jurors whose views would prevent or impair the performance of their duties as jurors, violated his state and federal rights to a jury drawn from a fair cross-section of the community by excluding from juries in capital cases a cognizable group of persons, and denied him equal protection under both the federal and state Constitutions. Even assuming defendant has preserved the claim, which he did not raise in the trial court, the high court has rejected the view that individuals who can be characterized as a group "defined solely in terms of shared attitudes" toward imposing the death penalty are a "distinctive group" for fair cross-section claims under the federal Constitution. (*Lockhart v. McCree, supra,*

476 U.S. at p. 174.) We too have rejected this claim under our state Constitution (*People v. Jackson, supra,* 13 Cal.4th at p. 1198; *People v. Ashmus* (1991) 54 Cal.3d 932, 956 [2 Cal.Rptr.2d 112, 820 P.2d 214]), and defendant offers no persuasive reason for us to reconsider that holding.

## IV. Gun Evidence

Defendant contends the trial court erred by admitting evidence that he was familiar with and possessed guns, permitting the jury to infer that he was among "a very small fraction of the general population" who know and use guns, and that therefore he was very likely to have been the man who robbed and killed bartender Toney.

### A. *Challenged Evidence*

On appeal, defendant argues the trial court erred by admitting over his objection four items of gun-related evidence. The three items of physical evidence—a Ruger pistol, an unloaded rifle, and some .22-caliber cartridges—were seized by police in searches conducted soon after the Anderson Lounge crimes. Each of the three items of physical evidence was found in a location closely associated with defendant. The fourth piece of evidence was defendant's statement, made almost two weeks before the crimes to a woman for whom he was then working, that he kept a "loaded .22" in his pickup.

### 1. *Ruger pistol*

On July 21, 1993, in searching Karen Grabenstatter's trailer home, where defendant was living at the time of the crimes, police found a .22-caliber Ruger pistol. At trial, defendant's former girlfriend, Margaret Alcock, with whom he had lived until May 1993, was asked if she had had any pistols during the time she and defendant lived together. Defense counsel objected to evidence of the pistol, arguing that Alcock's answer was "not relevant" and "highly prejudicial whether or not the District Attorney is trying to get into the case-in-chief an uncharged crime." Relying on defendant's denial, at the hearing on his motion to suppress evidence, that he had owned or possessed the strongbox found in Grabenstatter's storage shed, the prosecutor argued that the Ruger pistol was admissible because it, like the strongbox belonging to Alcock, was found at Grabenstatter's trailer home where defendant was staying at the time of the crimes. By connecting Alcock's Ruger pistol to defendant, the prosecutor sought to strengthen the link between defendant and Alcock's strongbox with its bar robbery proceeds—rubber-banded bundles of twenty-five $1 bills, and coins in G.A.M.E. wrappers. The trial court limited the prosecutor's inquiry to whether Alcock could identify as hers the pistol and the strongbox and jewelry found in it, cautioning the prosecutor not to

ask if these items had been taken without Alcock's permission. She testified accordingly.

## 2. *Rifle*

On July 22, 1993, Sergeant York seized defendant's pickup truck, searched it, and found an unloaded .22-caliber rifle with a missing magazine. When, at trial, the prosecutor asked Margaret Alcock if she could identify a photograph of that rifle, the defense objected that even if Alcock did not testify that her rifle had been stolen, the jury could "infer" that defendant had stolen it from her. The trial court overruled the objection. Alcock identified the rifle in the photograph as hers. The defense renewed its objection, which the trial court again overruled.

## 3. *Loaded gun*

During the testimony of Candida Kelly, whose roof defendant was replacing during July when he committed the bar crimes, the prosecution asked her about an incident on July 2, 1993, when defendant accompanied her to the bank to cash a $1,900 check to pay for roofing materials. As she left the bank, Kelly told defendant, "Hey, if you see anybody take my purse, go after them." The defense objected unsuccessfully, arguing the questioning would elicit evidence of a "different" uncharged crime.[2] According to Kelly, defendant replied, "I don't have to run after anybody, I carry a loaded .22 in the pickup." When Kelly asked why, defendant replied, "What good is it carrying an unloaded gun?"

## 4. *Cartridges*

Defendant notes that Sergeant York testified that, on July 21, 1993, during a search of defendant's Redding apartment, he seized eleven .22-caliber long-rifle cartridges from an ashtray on a coffee table. Defendant contends that this evidence was admitted over his objection. He is wrong. Before York was asked about the cartridges, the defense reiterated its suppression claim, which was directed solely to the seizure of the paper grocery bag and its contents from the apartment. York then testified, without objection, that he seized the cartridges. The defense objected *only* to admitting photographs showing where the cartridges were found, and that objection was overruled.

---

[2] Presumably, the second uncharged crime to which defense counsel alluded in objecting to defendant's statement that he kept "a loaded .22" in his truck was unlawful possession by a convicted felon of the Ruger pistol or the rifle, rather than the .22-caliber Colt revolver that was the murder weapon. Count 3 of the information charged defendant with being a felon in possession (§ 12021, subd. (a)) based on his possession of the Colt revolver that killed bartender Toney.

B. *Discussion*

Insofar as defendant objected at trial to evidence of the Ruger pistol and the rifle, he was objecting that the evidence was improper as evidence of an uncharged crime, because defendant's possession of Alcock's pistol, which she kept in a strongbox along with her jewelry and about $1,000 in cash, permitted the jury to infer that defendant had stolen both the strongbox with its contents and Alcock's rifle.

On appeal, defendant argues that evidence that he possessed Alcock's .22-caliber Ruger pistol, her .22-caliber rifle, and some .22-caliber cartridges, and that he kept a loaded .22-caliber gun in his truck was irrelevant because these weapons were not involved in the bar crimes and was highly prejudicial because the evidence "tended to prove [defendant] was a man who carried guns and ammunition all the time, " therefore impermissibly permitting the jury to infer that he was the perpetrator.

■ Evidence of crimes committed by a defendant other than those charged is inadmissible to prove criminal disposition or a poor character. "[B]ut evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (Evid. Code, § 1101.) Evidence of un-charged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. [Citation.] On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion." (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

■ To be relevant to prove identity, the uncharged crime must be highly similar to the charged offenses, while a lesser degree of similarity is required to establish relevance to prove common design or plan, and the least similarity is required to establish relevance to prove intent. (*People v. Lewis* (2001) 25 Cal.4th 610, 636–637 [106 Cal.Rptr.2d 629, 22 P.3d 392] [intent]; *People v. Kipp, supra,* 18 Cal.4th at pp. 369–370 [identity].)

■ Finally, for uncharged crime evidence to be admissible, it must have substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence. (*People v. Kipp, supra,* 18 Cal.4th at p. 371; *People v. Ewoldt* (1994) 7 Cal.4th 380, 404–405 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

Defendant relies on *In re Jones* (1996) 13 Cal.4th 552 [54 Cal.Rptr.2d 52, 917 P.2d 1175], where we concluded that reasonably competent trial counsel

would have objected to evidence the defendant was involved in a prior, unrelated shooting of a family member when the defendant was charged with shooting a close acquaintance. Here, defendant argues, as in *Jones*, the identity of the shooter was the crucial issue. Thus, he contends that evidence he possessed guns that were unrelated to the robbery and murder of bartender Toney was offered to establish his commission of the crimes, and such evidence was more prejudicial than probative. Although the trial court noted a parallel between the prosecutor's theory that defendant had stolen the murder weapon from Cutler (his former wife's landlord) and defendant's apparent theft of the Ruger pistol and the .22-caliber rifle from his former girlfriend Alcock, the prosecutor did not argue that the weapon evidence was admissible as evidence of a common plan or design.

The prosecutor offered Alcock's testimony identifying her Ruger pistol and her .22-caliber rifle to show that these weapons, accessible and available to defendant before the robbery and killing of bartender Toney, were found, after the robbery and murder of Toney, in defendant's truck and at his current girlfriend's home. Defendant's possession of Alcock's pistol and rifle helped to link him to Alcock's strongbox, and inferably to the robbery proceeds inside the strongbox, which Grabbenstatter found in her storage shed on August 17, 1993, over a month after the bar crimes. Finding that the prosecutor was " definitely not seeking to establish" that defendant stole Alcock's possessions, the trial court concluded that Alcock's identification of her guns was not prejudicial. In light of the limitations the trial court placed on Alcock's testimony (see *ante*, at p. 1121), the court did not abuse its discretion by admitting this evidence.

Evidence that defendant told Candida Kelly he carried "a loaded .22" in his truck also was admitted over an uncharged crime objection. It was admitted, however, only after the prosecutor made an offer of proof that defendant had not described the gun more precisely, and therefore inferably defendant was referring to the Colt revolver used in the robbery and murder. This evidence was therefore relevant to show defendant's identity as the perpetrator of the robbery and the murder committed with the Colt some 13 days later.

Defendant contends that evidence of the 11 long-rifle cartridges found in his apartment was not relevant to any issue in this case. Even if we assume he preserved the claim by his objection, he is wrong. Shasta County Sheriff's Deputy Ronald Clemens testified that some years earlier he had investigated an accidental shooting in which the victim had shot himself while attempting a quick draw with the same Colt revolver used in these crimes. Clemens's report, which he read from the stand, identified the murder weapon by its serial number and described it as a "Colt Single Action Frontier Scout 4-inch revolver, .22 Long Rifle." Clemens's testimony permitted the jury to infer

that the .22-caliber long-rifle cartridges found in defendant's apartment could have been used in the murder weapon.

None of the four items of gun-related evidence was unduly prejudicial. "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant." (*People v. Crew* (2003) 31 Cal.4th 822, 842 [3 Cal.Rptr.3d 733, 74 P.3d 820].) Whatever the truth of defendant's assertion that possession of guns and ammunition is "uncommon behavior," it was hardly such uncommon behavior among the witnesses at this trial, three of whom (Cutler, Alcock, and Grabenstatter) testified they owned guns, as to evoke intense emotional juror bias against defendant. Therefore, even had defendant objected to admission of this evidence as more prejudicial than probative, we cannot conclude the trial court erred by admitting it.

In light of our conclusion that the gun-related evidence was not unduly prejudicial, we reject defendant's contention that his conviction must be reversed because this evidence was admitted. It is not reasonably probable that had the gun-related evidence been excluded defendant would have obtained more favorable verdicts. (*People v. Watson* (1956) 46 Cal.2d 818, 835–836 [299 P.2d 243].) Nor are we persuaded that admission of this evidence violated defendant's right to due process of law under our federal Constitution, requiring us to determine whether the claimed error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]).

## V. EVIDENCE OF ATTEMPTED MURDER

Defendant contends there was insufficient evidence to support his conviction for the attempted murder of Eleanor Gallardo, arguing specifically that there was insufficient evidence to establish that he intended to kill her; that he took any act toward doing so; or that he acted willfully, deliberately, and with premeditation.

In reviewing a conviction challenged on the basis that the evidence was insufficient, this court " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations].' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) The same standard of review is applicable when the prosecution relies primarily on circumstantial evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

Here, the prosecution argued that bartender Toney's killing provided a model for defendant's attempt to murder bar patron Eleanor Gallardo. Toney's body was found lying facedown on the floor of a closet behind the bar with two gunshot wounds to her head and defensive injuries on her hands and arms. Defendant, identified by bar co-owner Munns and a number of bar patrons, arrived at the bar sometime between 9:30 and 10:00 a.m. and was the sole patron remaining at 12:15 p.m. when David Athenacio, the only other remaining patron, left. From this evidence, the prosecutor argued that defendant had waited for the other patrons to leave before he shot and robbed Toney.

Toney's defensive injuries and head lacerations indicated a struggle that ended when she was forced to the floor and shot in the head at close range. The timing and manner of her death permit the inference defendant intended to leave no witnesses. His plan was interrupted by Gallardo's unexpected entrance into the bar.

When Gallardo first encountered defendant, he had a bundle, presumably of cash and checks stolen from the bar, under one arm. Defendant pointed a gun at Gallardo and ordered her onto the floor, but she instead grabbed hold of the gun. She testified defendant kept trying to point the gun at her and in their struggle it fired. Defendant withdrew one hand from the gun to put Gallardo in a choke hold. When Gallardo, still holding the gun, twisted free of the choke hold, defendant initially pulled away from her, but as Gallardo fled from the bar he followed her outside.

 To prove an attempt, there must be proof of both specific intent to commit the crime and a direct, but ineffectual, act done toward its commission. (*People v. Swain* (1996) 12 Cal.4th 593, 604 [49 Cal.Rptr.2d 390, 909 P.2d 994].) Thus, to prove that defendant attempted to murder Gallardo, it was necessary to prove that he intended to kill her when he ordered her at gunpoint onto the floor or, as they struggled for control of the gun, when he tried to turn the gun on her and it fired. (See *People v. Hill* (1998) 17 Cal.4th 800, 827 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Gallardo, unlike Toney, refused to lie on the floor and struggled successfully with defendant when he tried to get a choke hold on her neck. Had defendant intended merely to incapacitate or delay Gallardo long enough to make his escape, he could have fled when she gained control of his revolver, but instead he followed her outside onto the sidewalk. His pursuit of Gallardo supports the finding that defendant intended to kill her. Moreover, the jury could reasonably have found that defendant's earlier acts—either his ordering Gallardo at gunpoint to the floor or his attempt to turn the revolver's barrel at her as they struggled—were consistent with that intent.

Defendant also argues there is insufficient evidence to establish that the attempted murder of Gallardo was premeditated and deliberated. He relies on *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] (*Anderson*), in which this court described three types of evidence that indicate premeditation and deliberation. They are: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.*, at pp. 26–27; see also *People v. Mayfield, supra,* 14 Cal.4th at p. 768.)

The *Anderson* factors are not the exclusive means for establishing premeditation and deliberation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) This court has, for example, concluded that an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive. (*People v. Hawkins* (1995) 10 Cal.4th 920, 957 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

We have never required that there be an extensive time to premeditate and deliberate. (*People v. Mayfield, supra,* 14 Cal.4th at p. 767; *People v. Perez, supra,* 2 Cal.4th at p. 1127.) Having successfully overpowered and murdered Toney, it would not have taken long for defendant to decide he could similarly dispatch Gallardo. Defendant already had a successful murder plan; he needed to decide only whether to implement it again. Premeditation and deliberation do not require much time (*People v. Hughes* (2002) 27 Cal.4th 287, 371 [116 Cal.Rptr.2d 401, 39 P.3d 432]), for " '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " (*People v. Mayfield, supra,* at p. 767.)

The evidence described at the beginning of this section, although circumstantial, amply supported the jury's findings that defendant premeditated and deliberated a willful murder of bar patron Gallardo patterned on the just

completed murder of bartender Toney, and that he intended to kill Gallardo from the time he pointed the Colt revolver at her and ordered her to the floor, until she managed to escape and run out of the bar with the gun, eluding his pursuit.

## VI. BIBLICAL REFERENCES

Defendant contends that the prosecutor committed prejudicial misconduct during his penalty phase cross-examination of defense witness Jack Stewart. Noting that Stewart had "mentioned the Bible and the Lord a number of times," the prosecutor asked, "You are familiar with the incident of the crucifixion of Jesus, aren't you?"

Stewart: "Yes, sir."

Prosecutor: "Couple of thieves that were crucified with Him?"

Stewart: "Right."

Prosecutor: "God forgave one of those people, didn't he?"

Stewart: "Yes, . . ."

Prosecutor: "Said, that's all right, I'll be there with you, right? . . ."

Stewart: "Yes."

Prosecutor: "Didn't stop the punishment, did he? . . . the crucifixion."

Stewart: "No."

Defendant did not then object to the prosecutor's questioning. During redirect examination, defense counsel asked Stewart: "I'd like to refer you to one other spot when the punishment was decreed by God to Cain and Abel, what was the punishment for the murder. Was it execution, or was it life?"

Stewart: "It was life."

Before final argument, the prosecutor expressed concern that there might be "references to [b]iblical passages" by the defense. Defense counsel noted that the prosecutor had brought up the crucifixion, "But, I felt as long as he was doing it, I should counteract with [Cain and Abel], so that they balanced out." After considerable discussion, the trial court directed both counsel not to discuss the biblical references. Defense counsel responded by moving for a

mistrial based on the prosecution's line of questioning, arguing: "I don't think [the evidence] can be struck. Nor can a curative instruction work." In his view, the prosecutor had appealed to biblical authority by relying on God's telling the repentant thief, "I'll forgive you, and I'll let you die." In defense counsel's view, witness Stewart was merely testifying about the power of religion to change people's lives, and not invoking Christian precepts either in support of or in opposition to the death penalty. Fearing "a negative impact" on the jury if he objected, counsel had made "a strategic decision" not to object at that point. The court denied the mistrial motion, but it expressly left open an opportunity for the defense to move to strike the testimony in question.

 It is misconduct for a prosecutor to invoke religious authority as support for imposing the death penalty, because by doing so the prosecutor urges the jury, in making a choice between life and death, to rely on an authority outside the court's legal instructions. (*People v. Roybal* (1998) 19 Cal.4th 481, 520 [79 Cal.Rptr.2d 487, 966 P.2d 521].) We have consistently held such prosecutorial reliance to be misconduct. (*People v. Ervin* (2000) 22 Cal.4th 48, 100 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Roybal, supra,* at p. 520; *People v. Hill, supra,* 17 Cal.4th at pp. 836–837.)

 To preserve such a claim, a defendant must object to the comments or seek a curative admonition. (*People v. Ervin, supra,* 22 Cal.4th at p. 100; *People v. Wash* (1993) 6 Cal.4th 215, 259–260 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) Defendant concedes that he neither objected nor sought a curative admonition, but he urges us to reconsider our rule that by failing to object he has forfeited the claim on appeal. He offers no compelling reason for us to do so.

In his reply brief, defendant belatedly argues that his lack of objection should be excused because a failure to object will not forfeit the issue for appeal when an objection would have been futile. (*People v. Anderson* (2001) 25 Cal.4th 543, 587 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Hill, supra,* 17 Cal.4th at p. 820.) Defendant cannot establish futility on this record. During the colloquy before final argument over biblical references, the trial court stated that "had there been an objection to [the prosecutor's] question, it would have been sustained." Defendant does not point to any earlier ruling by the court that would have caused defense counsel to believe it was futile to object to the prosecutor's questioning.

Although the prosecutor did not expressly argue that the Bible approved capital punishment, defendant maintains that message was conveyed by the prosecutor's questions to Stewart about the death of the repentant thief, one of two thieves crucified with Christ. The prosecutor emphasized that Christ

promised the repentant thief they would be together in paradise, but he did not prevent the thief's crucifixion. (Luke 23:39–23:43.) Instead of objecting to the prosecutor's questions, defense counsel once more questioned defense witness Stewart. Counsel asked about the punishment God meted out to Cain for murdering his brother Abel, emphasizing that God, instead of sentencing Cain to death, condemned him to life as wanderer. (Genesis 4:12–4:15.) Here both sides asked questions of Stewart, a witness who described his job as teaching men about Jesus. That questioning highlighted biblical passages in which one wrongdoer was punished for life and one was punished by death.

We emphasize that this is not a case of improper prosecutorial argument. Even in such a case, we have considered whether the defense itself relied on biblical text in assessing prejudice. (See *People v. Ervin, supra,* 22 Cal.4th at p. 100.) Here, neither the prosecution nor the defense relied in argument on biblical authority. Accordingly, even if the error were preserved for review, it was harmless beyond a reasonable doubt, the test we apply when, as here, a defendant establishes misconduct or error implicating rights under our federal Constitution. (*Chapman v. California, supra,* 386 U.S. at p. 24.) Likewise, we find the prosecutor's conduct harmless because there is no reasonable possibility that defendant would have received a more favorable verdict had the prosecutor not asked these questions, the standard we apply to state law error occurring at the penalty phase of a capital trial. (*People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 [131 Cal.Rptr.2d 468, 64 P.3d 762]; *People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

### VII. PROPORTIONALITY REVIEW

Defendant argues that his death sentence is disproportionate to his culpability under either an intercase or intracase proportionality review. We have in the past rejected the claim that *intercase* proportionality review is required by our federal Constitution. (*People v. Sapp* (2003) 31 Cal.4th 240, 317 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Anderson, supra,* 25 Cal.4th at p. 602.)

Defendant also argues that *intracase* proportionality review is required here because "there is nothing in particular to distinguish" his crime from "dozens or hundreds" of homicides resulting from "barroom holdups." He urges us to find his death sentence "grossly disproportionate to the offense" and to reduce it to life imprisonment without possibility of parole.

A defendant who requests it is entitled under the cruel or unusual punishment provision (art. I, § 17) in the California Constitution to intracase proportionality review to determine if the death penalty is grossly disproportionate to his culpability. (*People v. Weaver, supra,* 26 Cal.4th at p. 989.)

In this case defendant waited for other patrons to leave a bar in order to rob at gunpoint its female bartender. Whether he killed her because she resisted or because he intended to leave no witness, he shot her twice in the head at close range after beating her on the head and kicking her with the metal-capped toe of his cowboy boot. When he was interrupted by the entrance of a female patron, he turned the murder weapon on her, ordering her onto the floor. But for her refusal to comply and her successful resistance, she too would have been shot. After killing the bartender, defendant used some of the proceeds of the robbery to pay his utility and cable television bills and his overdue rent, and then he and his girlfriend visited a favorite bar. Given the brutality of bartender Toney's murder and the seeming callousness with which it was committed during the course of a robbery, the death penalty is not disproportionate punishment for defendant's crimes.

## VIII. CRUEL AND UNUSUAL PUNISHMENT

Defendant contends that the death penalty inflicts cruel and unusual punishment under both the federal and state Constitutions because of the often lengthy delay between the judgment of death and execution of that sentence. We have previously rejected this contention, reasoning that such delay is necessary to permit careful appellate review. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1176 [113 Cal.Rptr.2d 827, 34 P.3d 937]; *People v. Frye* (1998) 18 Cal.4th 894, 1031 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Defendant urges us to reconsider that holding, relying in part on what has been characterized as international opinion that is "generally against the imposition of capital punishment, but is willing to tolerate such sentences" provided they are carried out without inordinate delay. (Aarons, *Can Inordinate Delay Between a Death Sentence and Execution Constitute Cruel and Unusual Punishment?* (1998) 29 Seton Hall L.Rev. 147, 211; see *People v. Frye, supra,* 18 Cal.4th at p. 1030 .) As we recently pointed out, "we are not persuaded that international law prohibits a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Bolden* (2002) 29 Cal.4th 515, 567 [127 Cal.Rptr.2d 802, 58 P.3d 931].) Here, defendant's trial met those requirements.

Defendant also argues that by the time he is executed he will have become a person very different from the man who committed these crimes. He contends that not only will he be older, and thus "less likely" to engage in violence, but confinement will have alleviated the pressures that, at the time of the crimes, he found "overwhelming." Claims of personal growth or transformation are appropriately made to the Governor, who exercises his discretion to grant or deny clemency. (See *People v. Ansell* (2001) 25 Cal.4th 868, 891 [108 Cal.Rptr.2d 145, 24 P.3d 1174].) The mere possibility defendant may someday no longer pose a threat to society is an insufficient

reason for this court to revisit its prior holding that delay between sentencing and execution does not make a death sentence cruel and unusual. (*People v. Ochoa* (2001) 26 Cal.4th 398, 463 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Frye, supra,* 18 Cal.4th at pp. 1030–1031.)

## IX. DENIAL OF DEFENDANT'S SPECIAL INSTRUCTION NOT TO TREAT GUILT VERDICT AS AGGRAVATING

Defendant proffered a special instruction at the penalty phase. That proposed instruction told the jury it could "not treat the verdict and finding of first degree murder committed under [a] special circumstance[s], in and of themselves, as constituting an aggravating factor." The instruction then stated: "For under the law, first degree murder committed with a special circumstance may be punished by either death or life imprisonment without possibility of parole. Thus, the verdict and finding which qualifies a particular crime for either of these punishments may not be taken, in and of themselves, as justifying one penalty over the other. You may, however, examine the evidence presented in the guilt and penalty phases of this trial to determine how the underlying facts of the crime bear on aggravation or mitigation."

Instead of defendant's special instruction, the court gave standard instructions, including CALJIC No. 8.85. The jurors were told that "in determining which penalty is to be imposed . . . you shall consider all the evidence which has been received during any part of the trial" and "shall consider, take into account and b[e] guided by" factors including "[f]actor A, the circumstances of the crime [of] which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true."

Defendant advances two claims based on the trial court's rejection of his proffered instruction. He first argues that circumstances of the crime (§ 190.3, factor (a)) must include only those circumstances "unique" to this killing, a distinction he maintains is not clearly explained by the standard instructions. He is wrong. By giving CALJIC No. 8.85, the court instructed the jury to consider facts "unique" to this robbery murder as circumstances of the crime. (§ 190.3, factor (a).) Moreover, another standard instruction given to the jury defined "an aggravating factor" to be "any fact, condition or event attending the commission of the crime which increases its severity or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself." (CALJIC No. 8.88.) To the extent defendant's special instruction directed the jury to assess how "the underlying facts of the crime bear on aggravation or mitigation," it was duplicative of CALJIC No. 8.85. A trial court properly refuses to give an instruction that is duplicative. (*People v. Gurule* (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

Defendant next argues that CALJIC No. 8.85 allows the jury to infer at the outset of deliberations that there is already an aggravating factor in place—that is, the first degree, special circumstance murder. Accordingly, his requested instruction stated: "[T]he verdict and [the] finding which qualifies a particular crime for either of these punishments may not be taken, in and of themselves, as justifying one penalty over the other." This sentence in the rejected instruction misstates the law. CALJIC No. 8.85 tracks the statutory language; the statute directs the penalty phase trier of fact to "take into account any of the following factors if relevant" and then describes the first factor as "[t]he circumstances of the crime of which the defendant was convicted" and "the existence of any special circumstances found to be true." (§ 190.3, factor (a).) CALJIC No. 8.85 accurately describes the law as set out in section 190.3, factor (a).

■ In contrast, defendant's special instruction would have told the jury that the first degree murder verdict and special circumstance finding "may not be taken, in and of themselves, as justifying one penalty over the other." This sentence seemingly directs the jury determining penalty not to give any weight to the fact of a defendant's murder conviction or the existence of a special circumstance finding. That proposition is inconsistent with the language of section 190.3, factor (a). A trial court does not err when it refuses an instruction that incorrectly states the law. (*People v. Gurule, supra,* 28 Cal.4th at p. 659.)

Recently, we held that a trial court properly rejected a similar instruction that was offered by the defendant and stated: " 'The circumstances of a crime can be considered mitigating or aggravating. You are not authorized to consider the bare fact that [the defendant] has suffered a murder conviction as aggravating, but instead are required to consider the circumstances surrounding it.' " (*People v. Brown* (2003) 31 Cal.4th 518, 565 [3 Cal. Rptr. 3d 145, 73 P.3d 1137].) We held that the second sentence of this instruction was argumentative and was properly refused. (*Id.* at pp. 565–566.)

Even if, for the sake of argument, we were to assume the trial court erred when it refused to give defendant's special instruction, the error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.) As we have explained, "the circumstances of the crime of which the defendant stands convicted are the single most pertinent sentencing consideration." (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 479 [24 Cal.Rptr.2d 808, 862 P.2d 808].) Defendant maintains that there was nothing to distinguish his murder of bartender Toney "from any other premeditated or felony-murder killing." That contention is insupportable. The prosecutor specifically argued to the jury that section 190.3, factor (a)'s aggravating circumstances included the callousness with which Toney was treated, reminding the jury of the blows and kicks

to her head and the two gunshots at close range into her head while she was lying facedown on the floor with her arms crossed. Here, there was ample evidence from which a jury could infer that defendant overpowered Toney, forced her onto the floor, and then kicked her in the head before he summarily shot her. In short, there were circumstances attendant to this crime that increased its enormity.

## X. REFUSED MITIGATION INSTRUCTIONS

At the penalty phase, defendant offered four special instructions relating to mitigating circumstances that the trial court refused, concluding that they were less "evenhanded" than the standard instructions. He argues that these instructions would have accurately informed the jury that the determination of penalty was a qualitative decision and not merely a quantitative balancing of mitigating against aggravating circumstances.

Defendant's proposed special instruction No. 19 provided: "Since you, as jurors, decide what weight is to be given the evidence in aggravation and the evidence in mitigation, you are instructed that any mitigating evidence standing alone may be the basis for deciding that life without possibility of parole is the appropriate punishment." The instruction is argumentative because it states that any mitigating evidence may support a sentence of life without possibility of parole, but it does not state that any aggravating evidence may support a death sentence. (*People v. Hines* (1997) 15 Cal.4th 997, 1069 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

The jury was given CALJIC No. 8.88 (1989 rev.) (5th ed. 1988), which defined a mitigating circumstance as "any fact, condition or event which as such, does not constitute a justification or excuse for the crime . . . , but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty," and which states that "the absence of factors in mitigation does not require a verdict of death." This latter clause, implicitly, and other language in the instruction, explicitly, reject the "counting" method to which defendant objects. Thus, the jury was told that the weighing process was not "a mere mechanical counting of factors on each side of an imaginary scale" and told it was "free to assign whatever moral or sympathetic value" it deemed appropriate to each and all of the factors it was permitted to consider. (*People v. Smith* (2003) 30 Cal.4th 581, 638 [134 Cal.Rptr.2d 1, 68 P.3d 302] [counting of factors claim rejected in light of language in CALJIC No. 8.88].)

The trial court did not err by refusing special instruction No. 19 because as written that instruction was argumentative. Moreover, because the jury was instructed with CALJIC No. 8.88 that it was not merely to balance the number of aggravating circumstances against the number of mitigating

circumstances, and advised that it was to choose what weight to assign to any factor, it received an evenhanded framed instruction that addressed defendant's concern.

Special instruction No. 20 stated: "You may spare the defendant's life for any reason you deem appropriate and satisfactory." The trial court did not err by rejecting this instruction, with its sweeping language, in favor of the standard instruction, whose terminology reflects the statutory language.

Defendant's proposed special instruction No. 20A stated: "You need not find any mitigating circumstances in order to return a sentence of life imprisonment without possibility of parole. A life sentence may be returned regardless of the evidence." The second sentence of the instruction is wrong to the extent that it invites the jury to act without regard to the evidence, and duplicative to the extent that the jury was instructed that it was "free to assign whatever moral and sympathetic value" to the factors it was permitted to consider. Although the trial court refused to give special instruction No. 20A, it did instruct the jury that "[t]he defendant has no burden to introduce any factors in mitigation and the absence of factors in mitigation does not require a verdict of death." The first sentence of defendant's requested instruction would have been duplicative of the instruction given.

Lastly, proposed special instruction No. 32 stated: "Let me emphasize . . . . You may return a verdict of life imprisonment without possibility of parole even if you find that the factors and circumstances in aggravation outweigh those in mitigation." We have previously rejected the contention that such an instruction must be given. (*People v. Mendoza* (2000) 24 Cal.4th 130, 191 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Kipp, supra,* 18 Cal.4th at p. 381.)

To summarize, the trial court did not err in refusing to give defendant's proposed special mitigation instructions.

## XI. BURDEN OF PERSUASION

Defendant argues that it is inconsistent not to require the prosecution to bear the burden of persuasion at the penalty phase in a death penalty case when we require it to do so in all other criminal trials. In support of this contention, he relies on the constitutional guarantees of due process and equal protection and on Evidence Code section 520, which imposes on the prosecution the burden of proving guilt.

He urges this court to revisit its decision in *People v. Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376]. There we explained: "Because the determination of penalty is essentially moral and normative [citation], and

therefore different in kind from the determination of guilt, there is no burden of proof or burden of persuasion. [Citation.] The jurors cannot escape the responsibility of making the choice by finding the circumstances in aggravation and mitigation to be equally balanced and then relying on a rule of law to decide the penalty issue. The jury itself must, by determining what weight to give the various relevant factors, decide which penalty is more appropriate." (*Id.* at p. 643 .)

■ As we noted in *Hayes,* the jury's sentencing choice at a death penalty trial is fundamentally different from the trier of fact's determination of guilt (Evid. Code, § 520) under the determinate sentencing law. Choosing between the death penalty and life imprisonment without possibility of parole is not akin to "the usual fact-finding process," and therefore "instructions associated with the usual fact-finding process—such as burden of proof—are not necessary." (*People v. Carpenter* (1997) 15 Cal.4th 312, 417–418 [63 Cal.Rptr.2d 1, 935 P.2d 708].) We have previously rejected the claim that the prosecution bears the burden of persuasion at the penalty phase. (*People v. Sapp, supra,* 31 Cal.4th at p. 317; *People v. Kipp, supra,* 18 Cal.4th at p. 381; *People v. Bemore* (2000) 22 Cal.4th 809, 859 [94 Cal.Rptr.2d 840, 996 P.2d 1152].) Defendant advances no meritorious reason for us to reconsider the rule that, apart from other-crimes evidence, the jury need not be instructed on the burden of proof at the penalty phase. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 510–511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

Because there is no merit to defendant's constitutional or statutory claim, trial counsel did not perform deficiently in not requesting a jury instruction on the prosecution's burden of proof at the penalty phase.

## XII. Constitutionality of Death Penalty Statute

Defendant challenges various aspects of California's capital sentencing scheme as violative of the United States Constitution, and he contends this court should reverse or reduce his penalty to life imprisonment. In previous decisions, we have rejected the same challenges, as noted below.

■ Death is not an inherently unconstitutional punishment. (*People v. Martinez* (2003) 31 Cal.4th 673, 703 [3 Cal.Rptr.3d 648, 74 P.3d 748]; *People v. Jones, supra,* 29 Cal.4th at p. 1267; *People v. Samayoa* (1997) 15 Cal.4th 795, 864–865 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Nor does a prosecutor's discretion to seek the death penalty in a given case offend constitutional principles or protections. (*People v. Earp* (1999) 20 Cal.4th 826, 905 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Crittenden* (1994) 9 Cal.4th 83, 152 [36 Cal.Rptr.2d 474, 885 P.2d 887] .) As we have recently reaffirmed, neither our federal Constitution nor the societal interests at stake in a capital trial

require the jury to find beyond a reasonable doubt that death is the appropriate penalty (*People v. Jones* (2003) 30 Cal.4th 1084, 1126–1127 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Samayoa, supra,* 15 Cal.4th at p. 862), nor do they require a presumption of life (*People v. Jones, supra,* 29 Cal.4th at p. 1267; *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980]). The jury need not make explicit findings as to which aggravating and mitigating factors support its verdict. (*People v. Lawley* (2002) 27 Cal.4th 102, 168 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Anderson, supra,* 25 Cal.4th at p. 601.) The law does not insufficiently narrow the class of persons who are death eligible (*People v. Bacigalupo, supra,* 6 Cal.4th at pp. 465–468), nor does the robbery murder special circumstance include so many first degree murders it narrows the class of death eligible persons scarcely at all (*People v. Frye, supra,* 18 Cal.4th at p. 1029 [rejecting claim that felony-murder special circumstance makes "virtually all first degree murders" death eligible]).

 Finally, defendant urges us to reduce his sentence to life imprisonment without possibility of parole under sections 1181, subdivision (7), and 1260. This court has previously held that these sections do not give us the power to substitute our view of the appropriate penalty to be imposed for that of the jury. (*People v. Steele, supra,* 27 Cal.4th at pp. 1268–1269; *People v. Hines, supra,* 15 Cal.4th at p. 1080.)

## XIII. DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied June 23, 2004.