Filed 6/20/13  P. v. Olesh CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY JAMES OLESH,<br><br>    Defendant and Appellant. | A132983<br><br>(Contra Costa County<br>Super. Ct. No. 5-101327-5) |

## I.  INTRODUCTION

A jury found Jeffrey Olesh and codefendant Edward Fraser guilty of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)), finding true, as to Fraser, that he used a firearm and, as to Olesh, that a principal in the crime was armed with one (*id*., § 12022, subd. (a)(1)).  Each was sentenced to an aggregate six years in prison, Olesh's sentence consisting of a five-year upper term for the robbery (*id*., § 213, subd. (a)(1)(B)(2)), a consecutive one-year enhancement for the vicarious arming, and a concurrent two-year midterm for violating probation that had been granted for grossly negligent discharge of a firearm (§ 246.3, subd. (a)).

Olesh alone appeals, raising several claims of improper admission of evidence, a claim of ineffective assistance concerning his counsel's failure to object to a ruling that led to defense evidence not being introduced, and a claim of cumulative prejudice.  We affirm the judgment, finding no prejudicial error.

1

## II. FACTUAL AND PROCEDURAL BACKGROUND

The case concerns the armed robbery of Jennafer Dwinell shortly before midnight on January 2, 1010, at her job as nightshift main office manager at the Days Inn, in the 5300 block of Clayton Road in Concord. The brevity and stress of the encounter plus her assailants' concealing clothing left Dwinell unable to positively identify them at trial. This made the main issue for both defendants identity, and lent significance to accounts by their respective girlfriends. One testified at trial under immunity; the other's testimony from the preliminary hearing was admitted after failed attempts to locate and serve her for trial.

### A. *The Robbery*

Dwinell was working alone in the front desk area when, upon emerging from a restroom in the back, she saw a man enter the lobby and rush her way, wearing a black or brown cowboy hat low on his brow, a blue bandanna concealing his lower face, and a beige or off-white sweat suit, with matching top and bottom, like workout clothes. He walked up, grabbed her with one hand by the ponytail and collar, pushed her into some tables and chairs in a corner dining area, and commanded twice, "Get on the floor." Dwinell did not at first see a second man enter but became aware of him from talk between the two men about where the money was. The first man grabbed her again, pulled her back to her feet, and walked her around a half-wall divider into a small office (10 or 12 by five feet), where he demanded keys and then cash. His short stature compared with her own, his grip on her hair and collar, plus what felt like his other hand pressing into her lower back,[1] forced Dwinell's head and gaze upward, and she only saw the second man once they were all in the office. Both men wore bandannas, one red and one blue, and the second man wore a "beanie cap," jeans and a blue sweatshirt, and

---

[1] What pressed into Dwinell's back did not feel sharp to her, and while she was not focused on hands or another weapon, she did not see either man with an 8- to 10-inch green knife, and did not report to police seeing one. The initial intruder moved "like a man on a mission" and did not appear to have a limp or other physical disability, although Dwinell's initial position behind the half-wall impeded her view of his lower extremities.

carried a black gun that looked to Dwinell, who had experience firing shotguns, like a sawed off shotgun. He held the gun by its stock and barrel, in a "ready stance," and Dwinell noticed, on the floor of the lobby, a soft-carry guitar case she assumed had held the gun. Both men wore gloves, and Dwinell directed them to two drawers, one holding keys and the other cash. The man with the gun took their contents. Dwinell usually conducted transactions in credit and had come on shift that night without counting the cash, but she thought there had been at least one $20 bill, plus smaller bills, and certainly no more than $80 or $100 total. (She would tell an officer later that the amount was $50 or $60.)

In the office was a closed door that led to the apartment of live-in housekeeping and maintenance manager Mohib Nabizada, who was off duty but in the apartment. The gunman tried that door (*after* taking the money according to Dwinell), but it was locked. The shaking of the doorknob roused Nabizada, who figured it was Dwinell wanting something. So he left the apartment, not by the office door but by one that opened on a public hallway, walked down it, and peered into the lobby area through a glass-paneled door. Through the glass, Nabizada saw the men with their faces covered, one holding Dwinell from behind and the other in front. From surveillance monitors in the office, Dwinell and the intruders could see Nabizada peering in, and the first intruder said: "We've got company. Hurry up." Frightened, Nabizada quickly went back to his apartment and called 911, having noticed that one of the men wore a cowboy hat. The intruders left through the front lobby door, warning Dwinell to stay there and "not call the cops." The gunman then reentered to retrieve the soft case from the floor.

A video exhibit played for the jury, with descriptive narrative from witnesses Dwinell and then Nabizada, shows concurrent split-screen views from four surveillance cameras mounted inside the hotel. Three notably showing the two-minute encounter are one trained on the front door of the lobby, one in the lobby area before the desk, with the glass-paneled door through which Nabizada peered behind, and one with a view of the hallway down which Nabizada walked. The light-clad intruder enters first, not visibly armed but wearing loose fitting clothes. He trots without evident physical impediment to

3

Dwinell (partly visible just briefly) and goes out of camera range. Immediately behind him enters a taller, dark-clad intruder, who removes a shotgun from a black case and drops it to the floor before moving to the desk and then back across the lobby into the office, off camera. (What Dwinell described as a "beanie cap" on the second man was a knit cap pulled down onto his brow.) About a minute into the sequence, the first intruder crosses the lobby, steering a stiffly restrained Dwinell ahead of him, and goes off screen into the office. Nabizada immediately leaves his apartment and walks down the hall to the glass-paneled door through which he peers (visible on two cameras) until, with a troubled look, he retreats back to his apartment. Some two minutes into the sequence, both intruders reemerge from off screen and leave, the dark-clad one first, through the lobby's main door. Nabizada leaves his apartment again (presumably having called 911) and goes back to the glass-paneled door, through which he peers again just as the dark-clad man hurriedly reenters to retrieve the soft case from the floor before exiting again. Nabizada enters the lobby during that final exit and crosses the lobby, looking toward the office before hesitantly following the exit path of the intruders.

## B. *Victim's Identifications*

Dwinell said in testimony that she had limited opportunity during the robbery to see either man's face. Her view of the first man, given his cowboy hat and bandanna, was limited to the area between his eyebrows and lower eye sockets or cheekbones, and she saw his face for only about 10 seconds as he initially approached her from the lobby door. Her view of the man with the shotgun was longer and occurred in the office. It was 30 to 45 seconds at most but less than "a full spectrum" because she was still being restrained by the first man and "held upwards" (which the record shows she demonstrated by looking upwards, her head tilted up).

Six days following the robbery, after information to Concord Police Department (CPD) from Fraser's girlfriend, Danielle Wilson, focused suspicion on Olesh and Fraser, Detective David Ishikawa prepared six-person photo lineups involving each man and showed them to Dwinell at the hotel, giving her standard admonishments. Ishikawa testified that, for the lineup containing Fraser's photo, Dwinell narrowed it down to

4

photos number two (Fraser's) and four as the gunman, but saying that number two, based on the eyes and the bone structure of the face, looked more like the gunman than did four.

Regarding the lineup containing Olesh's photo, Dwinell was not able to identify any one photo; she told Ishikawa that none "jumped out" but that two of them (neither one being Olesh's) were definitely *not* the other man. Dwinell confirmed at trial that, based on her "[m]inimal" observation of facial structure and "overall apparent build," "breadth of shoulders and whatnot," she had been able to "rule people out for sure" but not make a positive identification, and she had also been shown still shots from the incident at that time. At the trial, nearly a year and a half later, she could not positively identify the two people who rushed in on her, although she identified the individuals in still shots from the video as depicting those who entered that night, and had done so as well at the preliminary hearing in November 2010.

## C. *The Wilson Lead and Arrests of Fraser and Olesh*

On the morning of January 7, 2010, five days after the robbery, Danielle Wilson contacted CPD about the robbery, and Detective Ishikawa spoke with her at the Vallejo apartment she shared with Fraser. In a back room, Ishikawa and Officer Greg Pardella found a soft guitar case containing a shotgun with a chambered shell, plus a pouch holding another 20 shells. The gun and case were consistent with those in the video surveillance, and Wilson, when shown stills from that surveillance, quickly and very positively identified Fraser and Olesh ("Corey and Jeff" to her).

Later that day, the officers arrested Fraser at his workplace, an Oakland hardware store. Hanging in the break room were his blue sweatshirt with white stripes, and a gray "beanie," both consistent with those worn by the gunman in the surveillance video. His Honda, parked nearby, had more shotgun shells, on the floorboard behind the driver's seat, and had a blue bandanna on the front passenger seat.

Late that same afternoon, Olesh was arrested as he used a key to enter his Concord apartment. He was with Amanda Torres. The arresting officer noticed that, while Olesh carried a bottle of prescription OxyContin, he had not evinced any disability in walking

5

some 100 feet to the apartment door and did not complain of pain. Officers found, on a table in his bedroom, a large fixed-blade knife in a sheath.

Wilson recounted at trial the events surrounding the January 2 robbery, using parts of interviews she had with officers soon after the event to refresh her recollection on many points. She was in a romantic relationship with Fraser that, she said, was "a little bit worse than just 'on the rocks,' " but shared a room with him at his Vallejo address. Fraser kept the shotgun and the guitar case in their room. Sometime after dark the night of the robbery Fraser drove her to a get-together at Olesh's apartment, which was next door to the Days Inn. Wilson drank vodka with cranberry juice while at the apartment, but remained coherent, not drunk. She did not know any of the several other people there except for Fraser, Olesh and Torres. Olesh and Fraser talked at some point about a Valero gas station situated on a corner across the street from the apartment. Wilson heard Olesh direct Torres to go see when it closed, and saw Torres leave the apartment. Torres returned, and when she left again, this time with Olesh and Fraser, Wilson followed her out onto the patio, not wanting to be alone inside with people she did not know. Fraser had the guitar case in his hands, and while she never actually saw the shotgun, it was inside the case.

Olesh and Fraser walked off in the direction of the gas station. Olesh wore a khaki-colored ("lighter khaki") jacket with black trim, and perhaps cowboy boots, and Fraser wore a black or blue sweatshirt with white stripes and lettering, a jacket that was a Christmas gift from his aunt that Wilson had seen him open. The men returned 15 to 30 minutes later, Olesh arriving first and handing his khaki jacket to Wilson over a tall fence enclosing the patio area before coming over the fence himself. He told the women to go inside and that he and Fraser would be in shortly. (Wilson told Detective Ishikawa that this took place around 11:40 p.m. and that Olesh, at the fence, handed her a knife as well as the jacket.)

A couple minutes later, Wilson saw Olesh inside, and then Fraser, who still wore the sweatshirt and may have come in through the front door. She was glad to see Fraser back, having worried about him, but sensed that "something obviously wasn't right." She

6

went to Olesh's room, where he and Fraser, and then Torres, had gone, and she heard the men conversing. One said, "We rob this bitch for only $19," and both men were "pretty pissed." Fraser pulled a wad of money from his pocket, uncrumpled and counted it, and the men "divvied it up" between them. Wilson, shocked, took Fraser aside and said something like, "What the fuck happened, like what went on[?]" Then when Fraser went into the bathroom, she confronted Olesh and asked, "What the 'F' did you guys do?" Olesh said, "[W]e only got fucking $19 out [of] it," and Wilson retorted, "Was it really worth it?"

Wilson wound up staying overnight at the apartment, after failing to persuade people she phoned to come and pick her up. Half an hour or more after the bedroom conversation, she heard that there were cops out front, and saw them herself in the Days Inn parking lot. She saw a purple bandanna at the apartment that night and noted in testimony that Fraser had long hair at the time and wore bandannas off and on. Somewhere inside the apartment she also saw a cowboy hat, not worn by Olesh but maybe being held by his roommate, Scott, who tended to dress like a cowboy.

Wilson was reluctant to come forward until motivated to contact the police by a talk she had with her father. She identified Olesh and Fraser from still photos Detective Ishikawa showed her within a week of the robbery. Identifying the photos again at trial, she explained as to Fraser: "Corey always wore glasses, that's his sweatshirt that he loved, that's his big choppy sideburns he used to have." She explained as to Olesh: "That's the jacket that I was referring to . . . . [T]hat's how I knew it was him." She confirmed that no one else at the party that night had a khaki jacket like Olesh's or a blue sweatshirt like Fraser's, and said that the cowboy hat Olesh wore in the photo appeared to be the hat she saw that night in the apartment. She did not see the men "gear up" that night.

**D. *The "Pretext" Call to Torres***

Wilson spoke with CPD officers on January 7 and 8, 2010, and the latter date involved Detectives Ishikawa and Jason Smith picking her up that evening from a San Francisco hotel, driving her out to the CPD in Concord, and there recording a "pretext"

7

phone call she made to Torres. A tape recording and transcript of the call were in evidence at the preliminary hearing, during testimony by Torres. At trial, Torres was an unavailable witness, but jurors heard the tape and viewed the transcript during the reading of Torres's preliminary hearing testimony.

The call was made on the evening of January 8th, after Fraser and Olesh had been taken into custody. Ishikawa guided her beforehand on subjects to cover and recorded the call, but Wilson did not reveal that to Torres, or that she was calling from the police station. Wilson conveyed a needy insecurity, fear of what police detectives knew, tension from pressure she felt from them, apprehension about what to tell them and what Torres had already said or would say, and concern that detectives not find physical evidence tying Olesh and Fraser to the robbery. Torres was guarded about talking about this on the phone, saying her mother had warned her that police could be listening ("[s]o that's why I'm just being careful"), and cautioned, "Danielle, why are you talking about this over the phone with me?" and "this alone could fucking get them arrested." Yet she seemingly tried to allay Wilson's fears until they could meet or talk the next day. She said she had been shown pictures of Fraser "holding the shotgun," but said Olesh was "all covered." She said the detectives "don't know shit," and were faking knowledge to harass Wilson or break her down. Wilson sometimes primed the conversation with details of the evening and robbery, obviously trying to draw Torres out. Torres acknowledged few details but did imply that she knew the men had committed the robbery, and assured Wilson variously that evidence had been "burned" or "disposed of," was "gone," was "gone forever," or just told her, "don't worry about it." Torres also alluded several times to having had dental surgery, mentioning taking "Percocets" for having her "wisdom teeth out," saying, "I have these gross ass gauze things in my mouth," and complaining toward the end, "My wisdom teeth are fucking (unintelligible) right now."

To Wilson's concerns about what Torres might have said, Torres assured, "I didn't tell them anything," adding: "But what I said was [Jeff and I] were fighting all night so we were barely talking. And . . . I was kind of jealous. I didn't want him talking to any other girls 'cause I—like we were fighting and stuff. I was kind of watching him. Like, I

8

never noticed him leave for more than five minutes at the back door to have a cigarette." [¶] . . . I know Jeff went to Safeway. He went probably around like 8:30 to 9:00. He was back in no longer than ten minutes. And the robbery didn't happen till 11:45." To Wilson's protest that the story was too complicated to remember, Torres said: "Well, we can't have the same story anyway. So you don't need to know anything about me and Jeff. All you need to know is what happened with you and Corey. You need to tell them you guys have been off and on since New Years, you guys broke up, you guys are trying—you guys are trying to work things out. She urged Wilson just to "say you don't know anything". "They have a witness—they have a witness seeing them in the hotel and leaving the hotel and running in different directions. That's it." By answering "Yeah" to Wilson's musing that the men had traumatized them and the victim all for a "measly" $19, Torres arguably admitted knowing the amount. She offered that Fraser perhaps had been trying to "protect" Wilson, saying: "I know that like he was broke and couldn't pay his bills. And Jeff didn't have any money to give him."

Wilson then pressed: "Everything that happened that night, we both know. We're gonna pinky promise we will not tell anybody that we know that Jeff and Corey did what they did. Pinky promise me." "I pinkie promise," Torres said, adding, "I'm not throwing you under the bus." Wilson urged: "We need to have the pact that we know that they did it but we're not gonna say anything. Promise me that right now." Torres reassured: "We have a pact. We have a fucking pact. I promise you." Asked about the photos, Torres said: "They just showed me the ones of Jeff. And you couldn't see Jeff. [¶] I saw a little bit of Corey from far away. It looked like (unintelligible)." She warned, "They're on you, like watching you like a hawk," and advised Wilson not to carry drugs, or they would use the threat of custody to increase pressures on her. She also cautioned: "Anything you can, be honest about. That's what I'm saying. Like, 'cause if they find a little fucking tiny lie, they're gonna think you're lying about everything. [¶] So like, I fucked myself over by saying my car was fucking at home, you know? So now they think I'm lying about everything."

9

**E.** *Torres's Preliminary Hearing Testimony*

Torres's testimony at the preliminary hearing, 10 months after the pretext call, was in part an exercise in studied denial as to anything she had said in the call. A grant of immunity overrode her privilege against self-incrimination; but she still considered herself Olesh's girlfriend; and his parents were in the courtroom. Her repeated claims of memory lapse, despite use of the call to refresh recollection, led the court to declare her a hostile witness and allow use of the call as prior inconsistent statements for "the non-hearsay purpose" of impeachment. At trial, the court instructed that jurors could use the call statements to assess the credibility of her prior testimony, and, to the limited extent that they found she spoke from personal knowledge of a defendant's acts or statements, for the truth of matters.[2]

The preliminary hearing transcript was read in some length at trial, with trial counsel on each side lodging objections for the trial court's rulings. Torres acknowledged being Olesh's girlfriend on the night of the robbery, "hanging out" with him that day, attending the party with him that night at his apartment, Fraser and his

---

[2] General instructions advised that one factor in evaluating any witness's credibility was to ask: "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?" and that, "If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject. Instruction specific to Torres, based on modified CALCRIM Nos. 319 and 318, added: "The testimony that Amanda Torres has given under oath was read to you because she was not available. And you must evaluate that testimony by the same standards that you apply to a witness who testified here in court. [¶] In addition to this testimony of Amanda Torres, you have heard evidence that Amanda Torres made other statements. And I'm referring by that to the telephone conversation that was recorded and was heard by you. [¶] Now, if you conclude that Amanda Torres made those other statements in the telephone call, you may only consider them in a limited way. Firstly, you may use them in deciding whether to believe the testimony of Amanda Torres that was read to you here at trial—that is, her testimony from the preliminary hearing. Secondly, if you find that from the statement or testimony it appears that Amanda Torres personally observed an act or statement of one of the defendants, and only in that instance, you may use the statement as evidence that the earlier statement is true."

girlfriend Danielle (Wilson) showing up, plus others, and days later getting the call from Wilson, the night after Olesh was arrested and Torres herself had spoken with police.

Her account of the party was that she and Olesh were fighting, and she was upset, probably about other girls. She stayed the whole evening except for walking once to the store and back, drank vodka, was drunk, probably passing out at the end of the night, and then stayed overnight. Being upset, she went to Olesh's bedroom for awhile and so did not see both men the whole time, but she only recalled them leaving the apartment together once, for about 10 minutes toward the start of the party, to buy alcohol. There were only periods of about five minutes where she did not see Olesh, but she did not pay as close attention to what Fraser did. Olesh wore blue jeans, turquoise shoes, a black "Fox" sweatshirt she had gotten him for Christmas, and a black baseball hat. She did not recall what Fraser wore. She did not recall anyone wearing a beanie, cowboy hat, or a sweater of the kind seen in the robbery surveillance video, and she thought she would have remembered a cowboy hat. Olesh and Fraser were still there at the end of the party, at midnight, and neither one spoke about a robbery. She remembered seeing cops outside later that night.

As for the recorded phone call with Wilson, Torres generally, but inconsistently, denied recalling anything she said in the call. This was despite having completely read and listened to the call before the preliminary hearing, and then, at the hearing, read parts of the transcript again to try and refresh her recollection. She recalled speaking a couple of times with Wilson after their boyfriends were arrested, and confirmed that it was her voice on the tape, but claimed no memory of what she " 'actually said.' " In fact, she " 'didn't really remember that day.' " She attributed her failed memory to the passage of time, and to having had her wisdom teeth removed that morning. She said she was on medication afterward, had gone back to sleep when she got home, and was awakened by the call. " 'Yeah I guess,' " she answered, when asked if she was " 'too high to remember' " it. On the other hand, she did recall not wanting to talk to Wilson about the robbery over the phone due to concern that police were listening in on the conversation. " 'I was listening to my mom,' " she said, who had advised her not to talk on the phone

11

because police might be listening in. She also claimed that she was not concerned about implicating her boyfriend and that her not wanting to talk with Wilson over the phone was: " 'Just because I wanted to meet up with her. We were both upset over our boyfriends, and I wanted to meet with her.' " Her testimony was internally inconsistent, as where she explained: " 'I mean, since I saw [the transcript of the call], I remember bits and pieces; but I don't remember saying any of it.' " The trial court, soon after that jumble, answered a defense objection that Torres had "no personal knowledge" with: "A person can be impeached by 'I don't remember.' Overruled."

When asked next whether she recalled telling Wilson she had lied to the police, Torres first answered "No" but then was able to elaborate after reading the call transcript: "I know what you're talking about now. What I was talking about—yeah, when they arrested Jeff, I lied about where my car was because I was scared and I left." She said she was referring to police asking her to wait in her car until they could take her statement; after 10 minutes, however, she " 'got scared' " and drove off to a store parking lot and lied to them by telling them she had gone home. In follow-up questions about why she was scared to speak " ' the truth' " to police and say Olesh was with her the whole night and did nothing, Torres said she was " 'upset' " because of Olesh's arrest and " 'needed time to cool down.' "

Torres then tried to distance herself from the " 'pinkie promise' " to Wilson not to tell what they knew. Asked if she made the pinkie promise, she first said: " 'No. I was just trying to calm her down.' " Then she double-waffled, saying " 'Yes, I said that,' " and then ," 'I just don't remember actually saying that.' " Asked next if she told Wilson that she saw surveillance pictures of Corey (Fraser) holding a shotgun, Torres replied, "I think I said something like, they showed me pictures,' " but then added, " 'I can't say I remember saying it' " and that the call would not refresh her recollection. Then she answered "No" when asked if she remembered asking Wilson where evidence from the case was, again saying her recollection would not be refreshed by the call. She also did not recall telling Wilson she had seen pictures of the robbery and that both defendants' faces were covered. At this point in the trial reading, the court allowed a tape of the call

12

to be played for the jury, over objection by Olesh's counsel that it was "improper impeachment."

After the playing of the tape, Torres was asked if she ever burned any of the evidence, and she said no. Asked, then, why she said that on the tape, she said, " 'I didn't say that' " then, inconsistently, that she did not remember the conversation due to her medication. Asked similarly whether Olesh told her to " 'lace up' " her story and, upon her denial, why she said so on the tape, Torres offered: " 'I said yes and no to every question, but I don't remember. So I don't know.' " Asked to explain, she said: " 'Every question she asked me I'm like, Yes, No, Yes, No, Yes, No, Yes, No. Honestly, I don't remember from the day it happened.' " This triggered inquiry into just what Torres did remember from the phone conversation, and elicited a broad denial that she remembered anything. Her denial, of course, contradicted her earlier testimony about various details of the call.[3]

---

[3] Questioning at the preliminary hearing had been by Deputy District Attorney Chris Walpole, who led this passage:

" '[Q]: What do you remember about this conversation?

" '[A]: What I just heard.

" '[Q]: What do you mean?

" '[A]: Like I remember what I just heard.

" '[Q]: The whole tape?

" '[A]: I don't remember what I said on that exact day. I don't remember saying any of this conversation.

" '[Q]: Okay. That's what I'm trying to get at. As you sit here today, what do you remember about the conversation? Do you remember anything as far as you sit here today?

" '[A]: No.

" '[Q]: Do you remember even having a conversation?

" '[A]: I mean, I remember I would talk to Danielle a couple times; but I don't remember remembering [*sic*] that specific conversation.

" '[Q]: Okay. So everything in this 18-minute conversation, the details of which you remember nothing, but you remember you had the conversation?

## F. *Defense Case*

Neither codefendant testified, but Olesh presented alibi witness Gaelan Shields, who described himself as a friend who did not want to see Olesh convicted of any crime. He also claimed to be less close a friend to Fraser yet "more than an acquaintance." Shields said he was at Olesh's place the entire time from about 8:00 p.m. to 2:30 a.m., to "hang out" with Olesh, that Olesh wore blue jeans and a darker blue T-shirt and no cowboy hat, that he left only for about 15 minutes at 9:00 p.m. (returning with alcohol and cigarettes), and that the only other time Olesh was out of sight was for 45 minutes to an hour when he went into his room with Torres.

In contrast to his certainty about what Olesh did and wore that night, Shields remembered little beyond there being eight to 15 people throughout the evening, drinking eight or nine beers but not being tipsy, and calling two women friends that night who joined him there. He did not recall when the women arrived or left, who they were, or what they looked like. Despite knowing of Olesh's arrest for the robbery since the month it occurred, Shields never came forward with his information until trial.

Olesh also called a police officer to testify that her trained German shepherd picked up a scent of some kind at the robbery scene (which was rife with contaminating scents), and followed it through the apartment complex, but lost it a couple of streets away. Another officer related that the victim, Dwinell, who was shaken by the robbery and said she thought she was going to die, said she estimated the value of the uncounted money taken in the robbery was $50 to $60.

Detective Ishikawa, recalled by the defense to further discuss his interviews with Wilson, said she never mentioned there being black trim on the jacket or a knife present in the apartment. She also did not mention, in her pretext call to Torres or her *initial* statements on the ride from San Francisco, anything about the Valero gas station. (Ishikawa explained that it was difficult for him to direct or inject himself into the "free flowing conversation" of the pretext call and that Wilson "didn't go there with it.")

---

" '[A]: I never said I remember having the conversation. I'm saying I remember having a few conversations with her after they got arrested.' "

14

Wilson also said in her initial statements, when asked about the guitar case and shotgun, something like, " 'No, that's the thing, I didn't see him the whole night with it[.]' " Later, however, she said she saw Fraser with the case (the gun being inside). She had also said initially that she was drinking vodka, but without mentioning mixing it with cranberry juice, and did not mention what Olesh wore when he emerged with Fraser from his room. Wilson had also read an article about the robbery online, and described a cowboy hat but then, after seeing still shots of the robbery video, said that she (or the article) had gotten the color of the hat wrong.

### III. DISCUSSION

**A. *Confrontation Issues as to Preliminary Hearing Testimony and Pretext Call***

Olesh claims that the admission at trial of Torres's preliminary hearing testimony and statements from the pretext call violated Evidence Code section 1291[4] and his Sixth Amendment right to confront witnesses as established by *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). Neither claim has merit.

"A criminal defendant has a constitutionally guaranteed right to confront and cross-examine the witnesses against him or her. [Citations.] The right of confrontation is not absolute, however, and may 'in appropriate cases' bow to other legitimate interests in the criminal trial process. [Citations.] An exception to the confrontation requirement exists where the witness is unavailable, has given testimony at a previous judicial proceeding against the same defendant, and was subject to cross-examination by that defendant. [Citations.]

_____

[4] All further section references in this opinion are to the Evidence Code unless specified otherwise.

Section 1291 provides in part: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." Former testimony, for this purpose, is defined in part as testimony given under oath in "a former hearing or trial of the same action." (§ 1290, subd. (a).)

15

"California permits the use of the prior testimony of a witness against a criminal defendant only when the unavailability of the witness and the reliability of the testimony are established.  [Citation.] . . . [Citation.]  The testimony is deemed reliable if '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.'  (Evid. Code, § 1291, subd. (a)(2).)

" '. . . [T]he "admission of the former testimony of an unavailable witness is permitted under . . . section 1291 and does not offend the confrontation clauses of the federal or state Constitution—not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of confrontation at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution." . . . [A] defendant's motive in cross-examining a witness at a preliminary hearing may differ somewhat from the motive at trial, but nevertheless the earlier testimony may be admissible at the trial under section 1291 because the "motives need not be identical, only 'similar.' " [Citations.]' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1172-1173 (*Carter*).)

Olesh does not challenge the court's finding that Torres was unavailable, a finding based on numerous attempts to serve her, locally and at locations in Southern California, and on a conclusion that she remained Olesh's girlfriend and was "hiding herself."  Olesh also does not dispute that his counsel, Roberta Brooks, who was also his trial counsel, in fact exercised the opportunity to confront and cross-examine Torres at the preliminary hearing.  What he argues, rather, is that his interest and motive in cross-examining Torres at the preliminary hearing were too dissimilar to satisfy the Sixth Amendment or section 1291.  He is unpersuasive.

Olesh cites a constant in this situation, that a defendant's interest and motive in confronting an adverse witness at a preliminary hearing differs because the degree of proof is less for a holding order than for a criminal conviction.  However, since the

admission of preliminary hearing testimony is " 'routinely allowed' " without offending statutory and constitutional rights (*People v. Seijas* (2005) 36 Cal.4th 291, 303), the differing standard of proof is clearly not enough, alone, to constitute error. A court looks for a similar, not identical, interest and motive. To paraphrase one case example, Olesh's "interest and motive in cross-examining [Torres] at the preliminary hearing were similar to those at trial: to challenge [her] credibility and discredit [her] account of the [events]." (*People v. Harris* (2005) 37 Cal.4th 310, 333.)

Olesh urges that things were significantly different here because of "[t]he nature of" Torres's testimony. At the preliminary hearing, she gave an account that was "largely favorable" to him, thus assertedly leaving "no motive" to vigorously cross-examine her. At trial, by contrast, he stressed that the most damning witness against him was Wilson, who had not testified at the preliminary hearing, and asserts that this elevated Torres's account to corroboration for Wilson's.

Olesh makes too much of Wilson being absent from the prior hearing, for her account was indeed in evidence at that hearing. Detective Ishikawa related in detail the various interview statements she gave, and Olesh makes no claim that those statements conflicted significantly with how they would be presented at trial, where Wilson testified personally. California law allows hearsay testimony to come into evidence at a preliminary hearing through the testimony of an officer specially trained in relating such hearsay. This hearsay recounting of victim statements at the preliminary hearing is well established (*Correa v. Superior Court* (2002) 27 Cal.4th 444, 464-466 [approving officer relation of translated statements]), and here Brooks vigorously cross-examined the detective about Wilson's statements without apparent limitation by the court. Thus, the use of Torres's account as corroboration for Wilson's stronger account was not significantly different at the preliminary hearing than it would be at trial. Brooks presumably anticipated that Wilson's account would be related by an officer rather than Wilson herself (§ 1203.1; Pen. Code, § 872), and nothing indicates that counsel expected her to be unavailable for trial. Thus, Olesh had reason to cross-examine Torres fully about any parts of her testimony that corroborated Wilson's account. Brooks in fact did

17

so, eliciting that her poor recollection was due to sleepiness, after general anesthesia that morning to have all four wisdom teeth extracted, and then taking probably four pain pills (perhaps Vicodin and a second drug). Brooks also elicited testimony of a strained relationship between Torres and Wilson. Wilson was nice to her but did not like her, Torres said, and created a lot of "drama" between herself and Olesh. Wilson was also "nice to Jeff's face" but "would make up rumors." Brooks seemingly pulled no punches at the preliminary hearing and, again, was not evidently limited there by the judge.

But Olesh focuses on the recorded call, urging that his motive and interest was rendered too dissimilar because it was admitted at the preliminary hearing only for the non-hearsay purpose of impeaching Torres whereas, at trial, it was further admitted for the truth of matters to the extent that jurors might find that Torres spoke from personal observation of acts or statements by a defendant (fn. 3, *ante*). Olesh calls this difference a "bait-and-switch" that effected a "blind-siding of defense counsel" on the need to cross-examine Torres about the truth of her call statements.

We disagree and find little analogy in the case law examples of dissimilarity Olesh cites. The prior proceeding here was not a suppression hearing where an informant's credibility was explored only in the limited context of whether police officers reasonably relied on his account (*People v. Sanders* (1995) 11 Cal.4th 475, 525-526 [pre-*Crawford*, court did not abuse its discretion in denying use of the prior testimony]) or a preliminary hearing where evidence was admitted only against a codefendant (*In re Jones* (1996) 13 Cal.4th 552, 572-573 [pre-*Crawford*, competent counsel would have objected based on § 1291, subd. (a)]). The fundamental issue in both of these proceedings was whether Olesh was one of the robbers, and Torres' statements to Wilson in the pretext call went directly to that issue, whether taken as true or just used to impeach Torres's exculpatory testimony. In both proceedings, the prosecution was using the call to show that Torres was covering up for Olesh in her preliminary hearing testimony.[5]

---

[5] For purposes of these confrontation claims, Olesh does not dispute the underlying premise, noted by the Attorney General, that Torres's call statements were admissible as prior inconsistent statements of an unavailable witness to the extent they

18

Olesh contends that, had he known at the preliminary hearing that the truth of Torres's call statements was at issue, his counsel could have tried to pin Torres down on what parts of her statements "were based on her own observations or Olesh's statements versus unsupported assumptions, speculation, or third-party hearsay," and thus perhaps limited or foreclosed all potential use of statements for their truth. On this record, however, this argument seems more theoretical than practical. Olesh is vague about what potentially "true" facts he has in mind. He alludes to suggestions by Torres, in response to Wilson's urgent and repeated requests for assurance, that any incriminating evidence had been disposed of, or even burned. But if we imagine a scenario where the judge at the preliminary hearing had, like the trial judge, ruled to admit some of her statements for their truth, it is hard to say how defense counsel Brooks would have accomplished a sorting out of assumptions versus personal knowledge beyond what Torres had already said. We have already set out her testimony at length (pt. II.E., *ante*). To broadly summarize, Torres had started out by repeatedly disclaiming memory of her statements in the call, despite attempts to refresh her recollection with the transcript, only to turn around and explain, inconsistently, what she meant by some of those statements. Then, late in the direct examination, prosecutor Walpole carefully probed Torres about what exactly she did remember saying in the call. Torres responded by denying memory of any statements at all (fn. 4, *ante*), and this was right after inconsistently saying, when probed about whether Olesh asked her to lace up her story: " 'I said yes and no to every question, but I don't remember. So I don't know.' " " 'Every question [Wilson] asked me I'm like, Yes, No, Yes, No, Yes, No, Yes, No. Honestly, I don't remember from the day it happened.' "

It is with that testimony in place that defense counsel Brooks stepped up to cross-examine Torres. One may argue that Torres's denials were not fully credible, given the

---

were inconsistent with her preliminary hearing testimony. (§ 1294; *People v. Martinez* (2003) 113 Cal.App.4th 400, 408-409.) In part III.B. of this opinion, *post*, we consider his separate claims of due process error regarding the call's admission, which he bases on claimed undue prejudice and lack of foundation.

waffling she had done, but Brooks surely saw her denials as benefitting the defense.  It is interesting, in fact, that Brooks chose *at trial* to let the reading of the preliminary hearing testimony end shortly after those denials, reading from her cross-examination only one small part that reinforced Torres's earlier statement on direct (made without reference to the call) that Olesh had never told her to " 'lace up' " her story.  The perplexing question is how Brooks would have gone about eliciting denials of personal knowledge about things Torres said in the call when Torres had just emphatically denied recalling *anything*.  It would have been a dicey exercise, and one that risked provoking the prosecutor to explore the subject further, via redirect examination.  (Cf. *People v. Cleveland* (2004) 32 Cal.4th 704, 747.)

While we are not specifically guided by Olesh as to how his counsel might have proceeded had the broader admissibility ruling of trial been in place at the preliminary hearing, we are confident that there was no confrontation right violation.  Although the call statements had been admitted only for impeachment, not their truth, Olesh had every reason at the preliminary hearing to explore their bases with Torres on cross-examination, in order to rehabilitate her otherwise exculpatory account.  Of course, this had already been accomplished in part by the prosecutor eliciting from Torres that she was just saying yes or no to placate Wilson—not to admit anything Wilson suggested.  The fact that Brooks opted at that point to let the record stand essentially as it was appears to reflect a tactical decision, not a lack of motive or interest in having Torres deny any foundation for whatever her call responses might otherwise suggest.  " '[A]s long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony under . . . section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective.'  [Citations.]"  (*Carter*, *supra*, 36 Cal.4th at pp. 1173-1174, italics added.)

B.  *Foundation, Undue Prejudice, and Due Process Regarding the Pretext Call*

Olesh separately attacks admission of the pretext call as lacking a foundation of personal knowledge by Torres and Wilson for some of their statements (§ 702, subd. (a)),

as containing statements by both women that he deems unduly prejudicial (§ 352), and as rendering his trial fundamentally unfair, denying him federal due process (U.S. Const., 5th & 14th Amends.). He raised the foundation and undue prejudice arguments below and, while not having raised a due process claim there, may do so on appeal to the narrow extent that he urges that the consequence of the errors he did raise was so serious as to violate due process. (*People v. Partida* (2005) 37 Cal.4th 428, 435-436.)

"To testify, a witness must have personal knowledge of the subject matter of the testimony, i.e., 'a present recollection of an impression derived from the exercise of the witness' own senses.' [Citations.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 356 (*Lewis*). "[T]he personal knowledge of a witness concerning the subject matter of his [or her] testimony" is a preliminary fact (§ 403, subd. (a)(2)), thus placing on the proponent of the proffered evidence "the burden of producing evidence as to the existence of the preliminary fact," and "the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact . . ." (§ 403, subd. (a)). The issue typically arises in the case law when there is a challenge to the witness's capacity to perceive and recollect, and our Supreme Court has held, in that context that, in a jury trial, a trial court "should allow a witness's testimony unless 'no jury could reasonably find that he has such [personal] knowledge." (*Lewis*, *supra*, at p. 356.) "A witness's uncertainty about his or her recollection of events does not preclude admitting his or her testimony. (*People v. Avery* (1950) 35 Cal.2d 487, 492 [uncertainty of recollection goes to the weight and not admissibility of a witness's testimony].)" (*Lewis* at p. 357; accord *People v. Dennis* (1998) 17 Cal.4th 468, 525; *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1150.)

Olesh resists applying that analysis to personal knowledge where capacity to perceive and recollect are not at issue. We do not. Whether a witness has personal knowledge of what she speaks can rest in whole or part upon her own testimony (§ 702, subd. (b)), which, as here, may be inconsistent, unclear or evasive, requiring resolution by a trier of fact. The statute speaks of "personal knowledge," not just its capacity component, as being a preliminary fact for this purpose (§ 403, subd. (a)(2)), and directs

21

the trial court, where proffered evidence has been conditionally admitted, to "instruct the jury to disregard [it] if the court subsequently determines that a jury could not reasonably find that the preliminary fact exists." (*Id*., subd. (c)(2).) "Unlike in other situations[, like the competence of a witness under sections 402 and 405], under . . . section 403, '[t]he preliminary fact questions listed in subdivision (a) . . . are not finally decided by the judge because they have been traditionally regarded as jury questions. The questions involve the credibility of testimony or the probative value of evidence that is admitted on the ultimate issues. It is the jury's function to determine the effect and value of the evidence addressed to it. . . . [T]he judge's function on questions of this sort is merely to determine whether there is evidence sufficient to permit a jury to decide the question. The "question of admissibility . . . merges imperceptibly into the weight of the evidence, if admitted." ' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 466-467 (*Lucas*).) Protection for an adverse party comes from the court's authority (or duty upon request) to "instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist" (§ 403, subd. (c)(1)), instruction which was given here (fn. 3, *ante*). Nor does Olesh persuade us that a different analysis should apply where the witness is unavailable to cross-examine at trial. Personal knowledge, like confrontation, does promote reliability of the evidence (*People v. Valencia* (2006) 146 Cal.App.4th 92, 103-104), but confrontation issues involve distinct criteria. We have applied those criteria and found no confrontation error from the call's admission (pt. III.A., *ante*); we are aware of no authority altering the analysis of personal knowledge questions where the witness in question happens to be unavailable for trial. Thus, under settled law, " '[T]he court may exclude the testimony of a witness for lack of personal knowledge only if no jury could reasonably find that [s]he has such knowledge' " (*People v. Anderson* (2001) 25 Cal.4th 543, 573-574, italics omitted), and "[t]he decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion. [Citations.]" (*Lucas, supra*, 12 Cal.4th at p. 466.)

Olesh's claim of error focuses mainly on uncertainty about Torres's personal knowledge that any evidence from the robbery was destroyed, and his underlying concern

22

is the standard jury instruction given below on drawing guilt inferences from attempts to conceal or destroy evidence.[6] Torres's call statements on that subject were reactions to urgent inquiries from Wilson about whether there was any evidence for the police to find. Torres never directly identified herself or anyone else in particular as having disposed of evidence, but she did repeatedly assure Wilson that there was no such evidence, saying, "don't worry about it," that "[e]verything's taken care of," or that it was "gone," "gone forever," "disposed of," or, as she said the last time, "burned." When asked with seeming reference to "Jeff" (Olesh), "When he destroyed the evidence, your hands were not on any of those clothes, right?" Torres replied, "No, I didn't do anything with any of his stuff." Olesh urges that, even if one discredits Torres's flat denials at the preliminary hearing of hearing about the robbery from either defendant, or burning evidence or saying that she did, one cannot tell from her call statements whether she had personal knowledge of destruction attempts, was relating something she took part in herself, or had just heard about it from Olesh, Fraser, or others. A jury could also believe, as she suggested in testimony, that she was just saying things to placate Wilson. The Attorney General counters, albeit more broadly than as to statements about destroyed evidence: "When heard in context, the statements [that] Torres makes during the pretext phone call support the conclusion that she was speaking about events that she personally witnessed. Thus, the trial court did not err in admitting the recording."

---

[6] The court instructed from CALCRIM No. 371: "If . . . a defendant tried to hide evidence[,] that conduct may show that he was aware of his guilt. If you conclude that a defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt just by itself. [¶] Now, if someone other than the defendant tried to conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about the conduct . . . or if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself. [¶] If you conclude that a defendant tried to hide evidence, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other defendant is guilty or not guilty."

23

In our view, the parties misframe the issue as error or lack thereof in *allowing* factual use of Torres's statement about disposing of evidence. Our reading of the record is that the court specifically ruled to *disallow* that use of the statements. As the parties are aware, there was a nearly 25-page discussion about this and other aspects of the call statements during the settling of instructions, and the court took the view that there was insufficient evidence of personal knowledge to use Torres's call statements on that point for their truth, as opposed to impeaching her preliminary hearing testimony denying knowledge of the codefendants' involvement in the robbery. In the course of that discussion, the court articulated most of the same concerns Olesh now presents on appeal and, at one point rejecting prosecutor Chad Mahalich's argument that one would have to imply that Torres "was either there or Mr. Olesh told her or both," the court responded, " . . . I think this situation about the burning is just too far removed." To implement the ruling, the court limited Mahalich to arguing to the jury just two areas of the call statements for their truth, both being areas where personal knowledge was more strongly apparent. One was Torres saying she had recognized both codefendants from surveillance still photos, and the other was her saying, or at least implying, that she knew they got only $19 in the heist. The court ruled: "I'm going to let [him] argue those two portions of the tape as establishing facts, and I'm going to reword [CALCRIM No.] 319 in a way to caution the jury to be careful [that] the statement has sufficient credibility to it that she has personal knowledge."[7] The court did alter the wording of that instruction

---

[7] The distinction between a discretionary ruling (*Lucas*, *supra*, 12 Cal.4th at p. 466) denying admission and one allowing admission affects our appellate review, for our duty is to view the ruling *deferentially* in light of the facts before the court (*People v. Garcia* (1999) 20 Cal.4th 490, 503). Because the ruling here *denied* use of evidence, the Attorney General's evident invitation to view the evidence most favorably to *admitting* it is misguided. The Attorney General relies on a reasonable inference that Torres knew of evidence being destroyed because she had personally observed it, but there are contrary reasonable inferences that require our deference. The Attorney General does also not argue that the ruling limiting jury argument was an abuse of discretion.

(see fn. 3, *ante*), and the prosecutor, as the Attorney General observes, did limit his jury argument to those two areas.**8**

The parties differ as to the effect of the court's limitation: the Attorney General implicitly views it as resolving the problem, but Olesh does not. Olesh has the better argument. Nothing in the court's instructions, or the prosecutor's argument on those two points, advised the jury that no other statements could be used for their truth, and CALCRIM No. 371 actually informed them that they *could* use the truth of the evidence-destruction statements to infer consciousness of guilt if they found that a defendant was present or authorized the act. (Fn. 7, *ante*.) Our Supreme Court has noted, in the context of examining a trial record for substantial evidence, that "the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

Thus the error in this case, if any, was not in the ruling *denying* use of the statements for their truth, but in failure to convey a limitation to that effect in the instructions. This is turn raises a serious question of forfeiture, for Olesh does not appear to have requested an appropriate limiting instruction following the ruling limiting the prosecutor's jury argument. Generally, "although a court should give a limiting instruction on request, it has no sua sponte duty to give one. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051, and cases cited therein; § 355.) The parties, who miscast the issue as error in the ruling rather than inadequate instruction, have not briefed the forfeiture issue. Rather than delay resolution of the appeal with a request for further briefing, we opt to assume without deciding, and purely for sake of discussion, that there was instructional error and that it is cognizable.

---

**8** Mahalich briefly argued, for example, early in his opening argument: "And defendant's own girlfriend, Ms. Torres, discusses [the] surveillance still shots, talks about seeing Defendant Fraser with the shotgun, seeing Defendant Olesh on the surveillance still shot with them being covered. [¶] Ms. Torres states she knows how little money was taken from the robbery and agrees to form a pact with Ms. Wilson not [to] talk about it."

That brings us to prejudice from failure to instruct the jury that it could not use any destruction-of-evidence statement for its truth. We find virtually none. It was reasonable to infer that Torres spoke from personal knowledge when she told Wilson that evidence was gone, taken care of, or burned, but instructions on using that evidence as true and against a defendant mandated, under a tailored CALCRIM No. 318: "[I]f you find that from the statement or testimony it appears that Amanda Torres personally observed *an act or statement of one of the defendants*, and only in that instance, you may use the statement as evidence that the earlier statement is true." (Fn. 3, *ante*, italics added.) Further, CALCRIM No. 371 told jurors that they could conclude from destroyed evidence that a defendant was aware of his guilt "only if the defendant was present and knew about the conduct . . . or if not present, authorized the other person's actions." (Fn. 7, *ante*.) Olesh's vigorous arguments now that such conclusions are unsupported is a concession against prejudice, because a bedrock presumption for us on appeal is that jurors understand and follow instructions. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) Nothing in this record rebuts that presumption.

But even accepting that a reasonable inference might weakly support Torres basing her statements on an act or statement of Olesh or that he was present or authorized actions by her, the key to this case was the credibility of Wilson. We have set out her account in detail (pt. II.C., *ante*), but to summarize: she was Fraser's girlfriend, knew both codefendants, and came forward days after the robbery to readily identify both from surveillance stills, and led police to the loaded shotgun and guitar case Fraser kept in their room at his Vallejo residence. She placed both men at Olesh's apartment next to the Days Inn on the evening of the robbery, and saw Fraser that night with the guitar case that held his shotgun. She identified the men as wearing clothing seen on the surveillance video, reported seeing the cowboy hat in the apartment that night (albeit getting the color wrong), knew the men had left for 15 to 20 minutes right around the time of the robbery, and reported that when they returned, Olesh handed her his light khaki jacket and a knife over the fence before leaping over himself. She heard the men talking in a miffed tone

26

about getting only $19 and confronted Olesh about what they had done.  Her tip to police led to the arrest of Fraser at work, where he had his distinctive blue jacket and his beanie with him.  It is hard to imagine that erroneous consideration of Torres's statements about evidence destruction, if considered for their truth and involving Olesh, had any effect on the jury's view of Wilson's credibility.  In fact, Wilson's cooperation with police was the reason the call took place and was surely viewed by the jury as boosting her credibility.  It is not reasonably probable that, absent the erroneous failure to disallow jury use of the truth of the evidence-destruction statements, the result would have been more favorable to Olesh.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  We are also confident that the error did not render this trial fundamentally unfair so as to rise to the level of federal due process error.  Even if it had, the error would appear to be harmless beyond a reasonable doubt based on the full record.  (*Chapman v. California* (1963) 386 U.S. 18, 24.)

Olesh also attacks, as lacking a foundation of personal knowledge (§ 702), call statements by *Wilson*.  He cites her telling Torres the following things:  " 'We know they robbed the fucking place.  Get real.' "  " 'Because the thing is, is Corey told me it was all Jeff and Jeff told me it was all Corey.' "  " 'Yeah.  19 bucks, yeah.  And they traumatized somebody now for their whole life.  And now they traumatized me and you.' "  Olesh reasons, as to the robbery and the amount taken, that Wilson must have relied to some extent on statements by the codefendants and, as to the traumatization, that there is no evidence that the victim was traumatized for life.  Then building on those arguments, Olesh claims error in not excluding those statements under section 352, urging that lack of foundation left the statements with little or no probative value and substantially greater risk of undue prejudice. Section 352 "gives the trial court discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice' " (*People v. Thomas* (2012) 53 Cal.4th 771, 806), and " 'the "prejudice" referred to in . . . section 352 [characterizes] evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues' " (*id*. at p. 807).  We uphold such a ruling "unless the court abused its discretion, that is, unless it exercised its

27

discretion in an arbitrary, capricious, or patently absurd manner. [Citations.]" (*Id*. at p. 806.)

Taking first the traumatized-victim statement, we note that the trial court expressed, apparently on its own, unease about having the jury hear it, and articulated this as part of general concern that prosecutor Mahalich might come to regret having successfully had the jury hear the entire call: "The more I read this," the court reflected, "the more I wonder if the People get a verdict in this case . . . if the appellate court won't throw it out for my letting them hear this transcript. That was a risk the People took, I guess." To Mahalich's "Yes, your Honor," the court added, apparently as an example no one had raised: "You never let anyone in the courtroom say they traumatized anyone for their whole life. I would not admit that." Mahalich replied that admission was not "for the truth," but Brooks took the cue, arguing: "You can't parse it out. I mean, you have the tape and you want to get snippets in that [are] for the truth and the bulk of it is [section] 352 and limited purpose. I think you just end up confusing the jury. This is why I'm objecting to allowing any of this to come in." It was then that the court ruled to limit use for the truth, saying with reference to Torres's mention of $19 and identification of both defendants, "I'm going to allow only the two portions that have been referenced[.]"

As we read the record, this was another example of something the court decided to remove from consideration for its truth, yet while not informing the jury of this through limiting instruction. Thus, while the parties again frame the issue as whether the court erred in *admitting* the evidence for its truth, the ruling actually was to *deny* such use, and we will assume, purely for the sake of argument, that there was cognizable error in failing to effectively implement the ruling through instruction. Therefore, the appropriate question for us is, again, possible prejudice from the lack of instruction. In this instance, however, the error appears to have been largely self-correcting. There was no basis at all in the evidence for the jury to conclude that Wilson—speaking just five days after the robbery and with no apparent relationship or contact with the victim, Dwinell—actually had any personal knowledge that Dwinell had been *traumatized for life*. The most any

28

juror could draw from the statement was that Wilson was using hyperbole to try and bait Torres into saying something incriminating against the codefendants.  Thus we see no risk that jurors considered the statement for its truth.  As for the section 352 aspects of the matter, the court acted within its sound discretion in rejecting defense counsel's concern that "parsing" the two uses of the evidence—impeachment versus truth—would confuse the jury.  Jurors were presumably capable of understanding and applying the instructions, and to deny use of Torres's statements altogether would have deprived the People of highly probative evidence impeaching her preliminary hearing account.  As the court reasoned, it clearly damaged "[t]he credibility of Ms. Torres pretending she didn't know anything about this at the preliminary hearing when in the conversation, if you take this thing as a whole, she's saying I sure as heck knew what was going on."  Weighed against that probative value was minimal risk that hearing Wilson speak of lifelong trauma created prejudice.  Common sense dictated that any normal person going through a strong-arm robbery of the sort Dwinell endured would feel trauma, and jurors had already heard from Dwinell herself:  "I was in fear for my life.  I didn't want to get shot."  And beyond that, jurors had no more basis than Wilson for believing that Dwinell would suffer *lifelong* trauma.  They had to appreciate that Wilson was trying to bait Torres with the remark about victim trauma, and as the remark that Olesh and Fraser had traumatized them as well.

On complained-of statements by Wilson that she knew about robbery and that it netted just $19, Olesh cannot show error under sections 702 or 352.  Wilson's knowledge of those matters had already been established, without foundational objection, in her trial testimony, where she recounted seeing the men leave the party in the direction of the Days Inn, saw them return and speak of the $19, saw them divide it up, and confronted Olesh about what she inferred they had done.  There was likewise no basis of undue prejudice for excluding the call statements when the matters were already in evidence and certainly not prejudicial in the sense of section 352.  "In applying section 352, 'prejudicial' is not synonymous with 'damaging' " (*People v. Coddington* (2000) 23 Cal.4th 529, 588 (*Coddington*), overruled on other grounds in *Price v. Superior Court*

29

(2001) 25 Cal.4th 1046, and superseded by statute as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1107, fn. 4), and this was evidence of the *charged* crime, not uncharged conduct (cf. *People v. Lenart* (2004) 32 Cal.4th 1107, 1123-1125 (*Lenart*)). As for Wilson's call statement that " 'Corey told me it was all Jeff and Jeff told me it was all Corey,' " this, too, would have been seen by the jury as baiting Torres and was not unduly inflammatory.

Finally, none of the erroneously or assumed-erroneously admitted statements from the call, even cumulatively, rendered Olesh's trial fundamentally unfair so as to constitute a federal due process violation. (Cf. *Lenart*, *supra*, 32 Cal.4th at p. 1125.)

## C. *Knife Evidence*

Olesh was not charged with any crime or enhancement involving use of a knife. The video surveillance did not show one, and the victim never saw one during the robbery, testifying that whatever was pressed into her back by the man who had her by the hair and collar had not felt sharp (fn. 2, *ante*). Wilson told Detective Ishikawa that Olesh, at the party, handed over the fence his jacket and a large knife, but then at trial, even after reviewing her interview, said she did not know. Ishikawa testified that police recovered a 12-inch fixed-blade knife in a black sheath, from atop a table in the bedroom Olesh shared with Torres at his apartment, and the knife and sheath were introduced in evidence. Ishikawa testified, on cross-examination by Olesh's counsel, that Wilson told him Fraser said a knife was used in the robbery, and Ishikawa replied "Yes," when asked, "And the individual who supposedly is carrying the knife is Mr. Olesh, correct?" Olesh claims that this evidence violated sections 1230 (hearsay exception for declarations against penal interest) and 352, and due process. We will hold that he is estopped to complain of being identified as the robber with the knife, and that admitting the knife itself was not error but, if error, harmless.

### 1. *The Knife-Use Testimony*

Debate about knife testimony began with an in limine motion by the People, who urged that it could be admitted, over *Aranda*/*Bruton* concerns of out-of-court statements of a nontestifying codefendant implicating another (*People v. Aranda* (1965) 63 Cal.2d

518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*)), if the statements fell within a firmly rooted hearsay exception. The motion posited possible application of exceptions for spontaneous declarations (§ 1240), declarations against interest (§ 1230), coconspirator statements (§ 1223), and adoptive admissions (§ 1221). The court ruled to disallow any reference to the evidence in opening statement and to consider later in the trial whether an exception had been established. It also clarified that, beyond opening statements, "That doesn't mean that the People can't make reference to what Mr. Fraser allegedly told Ms. . . . this witness about what he saw happen, you just can't identify the person"—meaning Olesh. The parties agree that the court had in mind the exception for declarations against penal interest, and the Attorney General does not try to justify admission under any other hearsay exception. Olesh claims error under sections 1230 and 352, and federal due process. We find him estopped to complain.

Section 1230 applies to statements of an unavailable declarant that "so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true" (§ 1230), a risk that ensures reliability for a declaration against penal interest and satisfies the confrontation clause. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 329.) But the exception is narrow in scope: "A court may not . . . find a declarant's statement sufficiently reliable for admission ' "*solely because* it incorporates an admission of criminal culpability." ' [Citations.] As the high court reasoned in interpreting the analogous exception to the federal hearsay rule, '[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory nature. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.' [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).) A court should therefore excise any portion of a statement that is not specifically disserving to the declarant (*People v. Duarte* (2000) 24 Cal.4th 603, 622), especially statements that inculpate or shifting blame to another (*id.* at p. 617), and this concern about collateral impeachment of a codefendant is implicit in the *Aranda*/*Bruton* cases (*People v. Leach* (1975) 15 Cal.3d 419, 441, fn.

31

17). We review a ruling on this exception for abuse of discretion. (*Lawley*, *supra*, 27 Cal.4th at pp. 153-154 [no abuse in admitting statement that declarant was paid to kill, and did kill, while excluding statement that the Aryan Brotherhood hired him].)

The Attorney General concedes section 1230 error, reasoning (record citations omitted): "[I]n its in limine ruling, the trial court permitted the prosecution to introduce evidence about Fraser's statements that his cohort had a knife. However, the trial court specifically cautioned that the evidence could not identify appellant as the cohort. The court's ruling was correct. The subsequent admission of evidence identifying [Olesh] as the individual with a knife should have been excluded. However, its admission was harmless."

We cannot accept the concession of error, first, because the in limine ruling was only that there could be reference to use of a knife, not that a "cohort" used it. Second, our review of the record shows that the prohibited link to Olesh was created by Olesh's own counsel, Brooks, and that Olesh is therefore estopped to claim error. We suspect that the Attorney General's ill-advised concession is based on a too-simple view that Olesh was identified as having the knife in "the prosecution's case." That is true but overlooks that it was Brooks who elicited the identification. She did so in cross-examining Detective Ishikawa, testimony mistakenly stated by the Attorney General to have been elicited by "[t]he prosecution."

We do, however, agree with the Attorney General that the court's in limine ruling was correct. Fraser's statement that a knife was used in the robbery plainly inculpated him as one of the robbers and was thus, to that extent, reliable and admissible so long as it was purged of any reference to Olesh as the one who had the knife.

Our estoppel holding requires a detailed exposition of the evidence. The first witness was Dwinell, during whose testimony the surveillance videos were played, and which our review confirms did not show either robber with a knife. The only exploration about a knife with Dwinell was when defense counsel Brooks asked on cross-examination if she saw either man with a long knife. Dwinell said she did not, saw no

sign of a knife, and felt nothing sharp pressing her back as the man who held her by the hair and collar "steered" her around.

The next mention of a knife was during the testimony by Detective Ishikawa. He said, on direct examination by the prosecutor, that a search of Olesh's bedroom turned up a fixed-blade knife and black sheath on top of a table, and that the knife and sheath were seized. This was part of identifying and offering into evidence various items seized in the searches of Olesh's residence and Fraser's workplace and car. The knife and black sheath were offered in evidence, without discussion, over "relevance" and "[f]oundation" objections by Brooks.

The first mention of Fraser's statement about a knife came during Brooks's cross-examination of Ishikawa. She began her examination by having Ishikawa confirm that the knife was found in its black sheath. Then, when she asked, "And in your police report, did you put that a knife was used in this robbery?" prosecutor Mahalich raised a hearsay objection that the court sustained. Brooks asked for a bench discussion, which was held but not reported or memorialized for the record.

Immediately after that discussion, Brooks broached the subject of Fraser's statement by this path: "Q. In your investigation in this robbery, did anyone tell you that a knife was used in the robbery? [¶] A. Yes. [¶] Q. In the actual robbery? [¶] A. Yes. [¶] Q. And that person was the night clerk? [¶] A. No. [¶] Q. Okay. And, in fact, that person was Ms. Wilson, correct? [¶] A. Yes. [¶] Q. And was she at the robbery? [¶] A. No. [¶] Q. Okay. And so she has no knowledge that that knife was used in the robbery?" This drew a "speculation" objection from Mahalich which the court sustained, saying, "He wouldn't know what she knows or doesn't know." Then Brooks continued: "Q. Well, did she tell—when she said that that knife was in the robbery—I think you said she wasn't there, correct? [¶] A. She wasn't. [¶] Q. Okay. Did she tell you that someone told her that the knife was used in the robbery? [¶] A. Yes. [¶] Q. She did. Can you show me where in the police report that she said someone told her the knife was used in the robbery[?] [¶] A. (Witness reviews report.) It would be on page 5 of my report, first paragraph. [¶] Q. Okay. So she stated someone else told her that the knife was used in

33

the robbery? [¶] A. It was Mr. Fraser who told, yes." Then, having herself elicited the answer, Brooks voiced an unspecified "[o]bjection" and moved to strike. Mahalich then sought a bench conference. One was held but, again, not reported or memorialized, and the court, once back on the record, overruled the objection.

Then, still during Brooks' cross-examination, came the revelation that Olesh was the one with the knife: "Q. Okay. And then—so when you met—now, when you talked to Ms. Wilson about this, the use of the knife, that was before you met with the clerk . . . , correct? [¶] A. Yes. [¶] Q. Okay. And so when you met with [the clerk], you wanted to know whether a knife was used in this incident, correct? [¶] A. Yes. [¶] Q. And you asked her about it, Was a knife used in this incident, right? [¶] Yes. [¶] Q. And she told you, No? [¶] A. She didn't recall. [¶] Q. She didn't recall seeing the knife? [¶] A. Yes. [¶] Q. Okay. So in your police report, you did not put the clerk recalled seeing a knife? [¶] A. Correct. [¶] Q. Okay. And now, that knife is about—what would you say, 8 to 10 inches long? [¶] A. I think I measured it. If I may, I'd like to refer to my report. [¶] Q. Yes, please. [¶] A. (Witness reviews report.) I measured it to 12 inches. [¶] Q. 12 inches, that's a pretty large knife? [¶] A. Yes. [¶] Q. And it's in a black sheath, correct? [¶] A. Correct. [¶] Q. All right. *And the individual who supposedly is carrying the knife is Mr. Olesh, correct?* [¶] A. *Yes*. [¶] Q. Okay. And now there are two individuals— okay." (Italics added.) Brooks asked if Ishikawa had seen anyone in the surveillance video carrying a knife, but the court sustained an objection, noting that the video would be in evidence and speak for itself. Brooks concluded: "Q. If that clerk saw a knife, told you she saw a knife, that would be in your police report, right? [¶] A. Yes. [¶] Q. And the fact that the clerk—and that isn't. The clerk telling you that a knife was used is not in your police report, correct? [¶] A. Correct. [¶] MS. BROOKS: No further questions."

Thus, Fraser's identification of Olesh as the one with the knife during the robbery was before the jury, contrary to the in limine ruling, and Brooks's questioning is what revealed it. One might wonder whether the court changed its ruling in the unreported bench discussions, but this is not shown by the record and is belied by a later discussion with counsel where the court adhered to its in limine ruling—albeit evidently unaware

34

that Brooks had already violated it.  Thus, Olesh's counsel placed the offending evidence before the jury, and the commonsense rule for this is that "a party who himself offers inadmissible evidence is estopped to assert error in regard thereto."  (*People v. Williams* (1988) 44 Cal.3d 883, 912 (*Williams*); *People v. Moran* (1970) 1 Cal.3d 755, 762.)

The record also shows a tactical basis for introducing the evidence.  (Cf. *People v. Brown* (2003) 31 Cal.4th 518, 560 [apparent tactical decision by counsel to withdraw objection to instruction rendered the doctrine of invited error applicable].)  Brooks evidently decided to use Wilson's report of Olesh having a knife as one more arrow in a quiver of Wilson's statements that Brooks would argue to the jury were lies spun because of a strong dislike of Olesh.  Discrediting Wilson was vital to the defense strategy, for she was the strongest witness against Olesh.  Brooks had already established through victim Dwinell that she could not identify Olesh as one of the robbers and never saw or even felt anything like a knife during the robbery.  No knife had been evident in the surveillance videos just played for the jury.  Revealing Olesh as the one reportedly having a knife in the robbery was surely a gamble, but Fraser's reported statement could reasonably be seen as having increasingly less sting against Olesh and greater utility as impeachment against Wilson, who, it could be urged, was making it all up.  Brooks would have been watching for juror reaction to the testimony, and she had an evidently credible witness, Ishikawa, through which to lay groundwork for her argument.  Through him, she laid this thinking:  Ishikawa's report did not mention a knife; the victim never reported one; the video did not show one; Wilson was not at the robbery yet reported to him—before he had himself interviewed the victim—that Fraser told her a knife was used; when Ishikawa then specifically asked the victim about this, she did not remember any knife; and finally, this would have been a large knife in a black sheath.  Brooks at that point elicited the link, using "supposedly" in implicit disdain for the idea:  "And the individual who supposedly is carrying the knife is Mr. Olesh, correct? [¶] A.  Yes. [¶] Q.  Okay.  And now there are two individuals—okay."  (The witness had already said there were two.)  Brooks must have decided that, better than letting use of a knife remain vague, it was useful to divulge the reported tie to her own client and argue that it was not actually an

35

account by Fraser, but one completely manufactured by Wilson out of contempt for her client.

Olesh suggests in arguing prejudice that Brooks, in her jury argument, was just trying "to mitigate the damage caused by the evidence." While he does not frame the idea as an argument against estoppel, we observe that ameliorative actions by counsel in the face of "an erroneous preliminary ruling on the admissibility of evidence to be offered by the prosecution" can avoid estoppel. (*Williams*, *supra*, 44 Cal.3d at p. 912.) That is not the case here. The court's in limine ruling allowing use of Fraser's statement only if purged of reference to Olesh was *correct*. Counsel's choice to breach the protections of that ruling therefore estops Olesh from claiming error on appeal.

The ensuing trial shows Brooks acting consistently with her tactical decision and, oddly, the court acting as though she had not breached the ruling.[9] Mahalich did not pursue the subject further in his witness examinations, or mention it in his initial jury argument. Brooks, on the other hand, kept highlighting anomalies in Wilson's testimony, including, in this exchange with Ishikawa: "Q. Now, with regard to the knife, we've heard [an] awful lot from Ms. Wilson about this knife. But when you interviewed the

[9] It seems that Brooks enjoyed the best of both worlds, breaching the ruling for tactical reasons while having the court continue to enforce it as if intact The next day, for example, when prosecutor Mahalich wandered near the identification of Olesh during examination of Wilson about what she told Ishikawa on the car ride from San Francisco, the court on its own motion called a conference outside the jury's presence. The colloquy and what followed make clear that, during that car ride, Wilson said that Fraser told her Olesh had held a knife up to the victim's back. This was part of what Fraser said when she confronted him at the party by saying, "[W]hat the 'F' did you guys do?" The court reminded counsel of its prior rulings that there would have to be a further ruling before "evidence of what one of the defendants might have said that implicated the other one" was admitted, and Mahalich assured the court that he had instructed Wilson not to reveal forbidden parts of the interview.

Mahalich also argued, correctly but ineffectively, that Brooks had "opened the door" about the knife. Reading through the preceding day's testimony, Mahalich went through most of what we have quoted in text above. The problem is, he stopped reading just short of Brooks eliciting: "And the individual who supposedly is carrying the knife is Mr. Olesh, correct? [¶] A. Yes." This understandably left the court unimpressed with the opened-door argument, and the ruling intact.

36

victim and you went over her statement, she made no mention about a knife being present, correct? A. Correct." She also elicited, near the close of Wilson's testimony, that Wilson did not like Olesh, and thought Fraser was "completely different" from Olesh and too easily influenced by him. She said she had "chalk[ed] them up as butt buddies."

Then in jury argument, Brooks unleashed a torrent of attacks on Wilson's credibility that included equivocal or "evasive answers," her butt-buddies "pejorative" and dislike of Olesh, drinking vodka at the party, reporting just $19 being taken (contrary to Dwinell's estimates) and that a cell phone was taken (denied by Dwinell), not initially reporting the Valero gas station or seeing the shotgun, not describing trim or a hood on the khaki jacket, getting the hat color wrong, not mentioning the gas station in the pretext call, and being aggressive and pushy in the call. Brooks's exploitation of the knife statement, as is detailed later in this opinion (pt. III.C.2., *post*), was particularly strident, the statement and knife in evidence being used to slam Wilson as a liar.

Olesh's tactically-based introduction and exploitation of the knife statement from Fraser estops him from complaining about it on appeal, both as to his sections 1230 and 352 claims (*Williams*, *supra*, 44 Cal.3d at pp. 912-913), and his consequent federal due process claim (cf. *People v. Crittenden* (1994) 9 Cal.4th 83, 158-159).

## 2. *The Knife*

Defense counsel was not responsible for placing into evidence the knife seized from Olesh's room and in fact objected unsuccessfully on "relevance" and "[f]oundation" grounds. Olesh claims that the court abused its discretion under section 352 because the probative value was substantially outweighed by risk of undue prejudice, and that this also violated his federal due process right to a fair trial.

We agree with Olesh that the knife, never identified as the one to which Fraser referred and with no knife noticed by the robbery victim or appearing in the surveillance videos, did not have a great deal of probative value. On the risk side, however, a large knife found as here, sheathed and on a table in Olesh's bedroom, was hardly something that "uniquely tends to evoke an emotional bias against defendant as an individual" (*Coddington*, *supra*, 23 Cal.4th at p. 588), especially in this case. Fraser kept a shotgun

in his room, and even the victim was familiar with and had experience firing shotguns and "several different forms of weapons." As our Supreme Court reasoned in rejecting a claim of section 352 error in admitting multifold evidence that the defendant had ammunition and carried loaded guns, "Whatever the truth of defendant's assertion that possession of guns and ammunition is 'uncommon behavior,' it was hardly such uncommon behavior among the witnesses at this trial, three of whom . . . testified they owned guns, as to evoke intense emotional juror bias against defendant." (*Lenart*, *supra*, 32 Cal.4th at p. 1125.) The evidence was held "not unduly prejudicial" (*ibid*.), and it would be anomalous to conclude, with the witnesses here, that a large knife was unduly prejudicial. It was not, and there was no section 352 abuse of discretion in admitting it.

Alternatively, any such error was harmless. The prosecutor made no mention of the knife in his opening arguments. Brooks then made *combined* use of the knife, along with the knife statement by Fraser, to cap her arguments against Wilson's credibility: "Now, this is what's really incredible. Why else do we know she's not been truthful about anything . . . . [¶] . . . She talked about a knife being used in a robbery. This is Exhibit 60-A. You guys have all seen that video over and over and over and over again. There is no knife in that video. Where is the knife? And see it's in a dark sheath. The person who apparently did the robbery, if I may show you this exhibit . . . . You know . . . what Danielle Wilson is trying to say, this individual in light-colored clothing is Mr. Olesh. [¶] Now, how do you miss a knife in a . . . black sheath against an individual wearing light clothing? You're going to see it. You guys have seen that tape. . . . Ms. Wilson is making things up because she doesn't like Mr. Olesh. [¶] Also, we know that Ms. Wilson made this up because I would think the victim would have said there was a knife. I mean, you look at the size of this knife. It's huge. . . . [I]t's heavy, and you can pick it up. But why wouldn't the victim see this? You would think if somebody was going [to] bring a knife [to] a robbery, they would be waving it around. But you don't see it. Why? Because it's another—I hate to use the word, but it's another lie by Ms. Wilson. . . . It's another statement used to implicate Mr. Olesh, a person she hates."

In response to that hybrid argument, prosecutor Mahalich spent a lot of his time rebutting the broader notion that Wilson was lying. On whether a knife was used in the robbery, he told jurors: "Made a big deal, there is no way there could have been a knife. Well, yeah, there is. These are baggy clothing [*sic*]. There could have very easily been a knife. [¶] Again, there's no evidence to suggest one way or the other except for what you heard here. And very easily there could have been a knife under the jacket. At no point was it argued that there had been a knife held up to the victim. She testified, quite frankly, she had no idea what was in her back. Again, it's something to confuse you, to distract you from the issues in this case." Thus Mahalich correctly treated the matter as a red herring having nothing to do with the charges (contrast *People v. Riser* (1956) 47 Cal.2d 566, 577), and more to the point, nowhere did he mention the one found in Olesh's room or insinuate that he was a bad or dangerous character for having one.[10]

No prejudice appears. Adapting slightly apt language from the *Lenart* case, about gun evidence: "It is not reasonably probable that had the [knife] related evidence been excluded defendant would have obtained more favorable verdicts. (*People v. Watson*[*, supra,*] 46 Cal.2d [at pp.] 835-836.) Nor are we persuaded that admission of this evidence violated defendant's right to due process of law under our federal Constitution, requiring us to determine whether the claimed error was harmless beyond a reasonable doubt (*Chapman v. California*[*, supra,*] 386 U.S. [at p.] 24.)" (*Lenart*, *supra*, 32 Cal.4th at p. 1125.)

---

[10] Olesh's briefing twice mounts a single analysis of prejudice based, not only on undue prejudice from the knife's admission, but also from claimed violations of sections 1230 and 352, and due process, in identifying him as the one Fraser reportedly said used a knife in the robbery. He is estopped, however, by his trial counsel's actions in placing the Fraser statement before the jury, from complaining of any such error now, and therefore cannot complain of ensuing prejudice either. It follows that he cannot combine prejudice from the Fraser statement with prejudice under section 352 from admission of the knife itself.

**D.** *Ruling to Admit Evidence of Prior Use Disability*

The issue first arose during in limine motions. Brooks had informally alerted the prosecution of her intent to call two physicians. One, Dr. Rieglers, would testify that Olesh had limited mobility, that surgery on his left foot had not gone well, and opine that "it would be 'unlikely that [Olesh] could run, hop, or move quickly.' " The other, Dr. Reid, would opine, based on viewing the surveillance video, that "the person on the video is not Mr. Olesh." The People moved to exclude the evidence, noting that Olesh had provided no discovery, and arguing that physician opinions on those subjects, about events occurring nearly 18 months earlier, would be speculative, lack relevance, and exceed the purview of even medical experts. Lacking specific information about when Olesh's foot surgery was and how it went, they also sought a section 402 hearing on the evidence to determine relevance before admitting it.

Alternatively, should the medical evidence be allowed, the People moved to admit prior conduct not charged in this case, both to impeach the supposed injury and doctors' opinions, and to show "a pat alibi." Their proffer was that, twice just a year before the robbery, and while wearing a cast (or "soft cast") a month after surgery on his foot, Olesh "fabricated and elongated any true effects of his injury (if one existed)" to mitigate or try to deter discovery of firearm violations. On January 15, 2009, he shot the car of a woman named Woods outside a party in Martinez. As Woods drove off with a passenger after talking with Olesh, Olesh returned to his car, retrieved a rifle, and shot the car. Charged with malicious discharge of a firearm at an occupied vehicle (Pen. Code, § 246), Woods admitted the shooting but "stated that he 'slipped' and fired the gun because of his cast on his foot." He ultimately pled guilty to a lesser charge of willful and grossly negligent discharge of a firearm that could result in injury or death (*id.*, § 246.3). Then, on January 22, just a week after and during investigation of the first offense, Walnut Creek officers stopped his car and had him step out to be pat-searched. Asked by the officer to spread his feet further for the search, Olesh said he could not because he was "wearing a boot" but then said, when they resumed searching, "Okay, I've got a gun in my waistband." At a hearing on the motion, the People proposed calling an officer in each incident, plus

40

perhaps the victim in the first, who would say what she saw him do and that she did not notice any limp.

The court ruled that, subject to discovery and a review of the actual evidence, Olesh could present medical testimony about his physical condition and capabilities, although not on the ultimate question for the jury of whether he was the one on the video. The court also ruled that the People could impeach that evidence with the two prior incidents, albeit cleansed of undue prejudice (§ 352) from references to any charges or resulting convictions, or that he had a gun in his waistband.

We see no indication in the record that the defense ever obtained or presented for the court's review the medical evidence, but Brooks raised the matter again by a filing just before the defense case, proposing to show physical disability through observations by two lay witnesses. Gaelan Shields, the friend who went on to give alibi testimony, would testify that Olesh met him outside a bowling alley at 8:00 p.m. on the evening of the robbery and drove him to the party at the apartment. In walking about 40 yards to the car, Shields noticed that Olesh was limping and had to slow down for Olesh to keep up with him. Freddy Montes would testify that Olesh employed him as a dispatcher for a couple of months at the end of 2009, and that he occasionally saw Olesh walk with a limp. The theory proposed by Brooks in the filing was that these lay witnesses would not be offering medical opinions, and thus remove the basis for the People using the prior incidents as impeachment. The court heard argument on the matter but was unpersuaded that the expert/lay distinction made a significant difference. It adhered to its prior rulings.

Brooks never put on the physical-disability evidence, medical or lay, and Olesh did not himself testify. Olesh claims error in the rulings. Cognizant of the *Luce/Collins* rule barring a defendant from claiming error in an impeachment-by-priors ruling unless the defendant testified at trial (*Luce v. United States* (1984) 469 U.S. 38, 43 (*Luce*); *People v. Collins* (1986) 42 Cal.3d 378, 385 (*Collins*)), Olesh tries to distinguish it away and, should he fail in that, contends that Brooks rendered constitutionally ineffective assistance of counsel by not preserving the issue by presenting the disability evidence.

41

We shorten the analysis by reviewing the ruling on the merits, assuming purely for sake of argument that the *Luce/Collins* rule does not bar review. (Cf. *People v. Ayala* (2000) 23 Cal.4th 225, 273 [reaching claim on the merits without deciding whether *Luce/Collins* rule should extend to bar review of an in limine ruling as to a witness the defense did not present].) Olesh claims that the ruling was erroneous and denied him federal due process. We disagree.

Much of Olesh's argument rests on section 1101, subdivision (a), which prevents use of uncharged criminal conduct "to prove his or her conduct on a specified occasion" unless offered under subdivision (b) to prove some fact at issue like identity, plan, intent, or knowledge, a process which invokes a crystallized process that includes weighing, under section 352, the risk of undue prejudice from the jury hearing about uncharged conduct. (See generally *People v. Ewoldt* (1994) 7 Cal.4th 380.) Thus he argues, for example, that "the bad acts evidence" here was not sufficiently similar to warrant use to show identity or a common plan.

In our view, however, that is not the analysis needed here, or seemingly undertaken by the trial court. The prior conduct here was *related to* bad acts with firearms, one of which resulted in a criminal charge and a conviction, but the bad acts themselves were not offered to prove anything. What were offered were Olesh's use of a physical limitation to excuse what he did in one instance (firing a gun) and did not do in the other (spreading his feet), and it was ruled admissible to impeach evidence he might present that the same or similar physical problems made it unlikely that he was as agile as the robber seen in the video trotting up to and strong-arming the victim, or able to leap a tall fence outside the apartment, as Wilson had testified. Section 1101, subdivision (c), specifically states, "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." Evidence of Olesh's prior excuses would *support* the credibility of the victim and the arresting officer, who noticed no impairment, and Wilson, who saw Olesh scale a tall fence. The evidence would also *attack* the credibility of any defense witness who suggested that Olesh walked with a significant limp. (§ 780.) The defense no doubt would have offered contrary views, but a

42

reasonable jury could find that Olesh feigned or exaggerated physical impairment in one or both of the prior instances.

Some confusion on Olesh's part may arise from discussion below about whether his earlier conduct showed "alibi" or "pat alibi," but this referred to a holding in a case cited by the prosecution, *People v. Ricketts* (1970) 7 Cal.App.3d 441 (*Ricketts*), and did not compel "bad act" analysis under section 1101, subdivision (b). The juvenile defendant in that case had been stopped on the Hollywood Freeway driving a stolen car and, at trial, testified, with corroborating witnesses, that he had borrowed the car from a friend named Skip Frizzell who lived in MacArthur Park and that Frizzell had assured him that the car, which lacked an ignition key, was not stolen. (*Ricketts*, *supra*, at pp. 443-444.) The prosecutor was allowed to impeach the defendant with evidence that he had been stopped four months earlier for driving another stolen car and similarly told an officer that he had borrowed it from a friend at MacArthur Park. (*Id*. at pp. 444-445.) The evidence had gone to the jury on instructions, consistent with section 1011, subdivision (b), limiting use to show intent, or absence of ignorance or mistake. (*Id*. at p. 445.) Citing such case law, the Court of Appeal held: "The evidence here in question was highly relevant as tending to establish that the defense testimony about the friend in MacArthur Park loaning defendant the car, was fabricated. From such evidence it could reasonably be inferred that defendant had a 'pat' or 'ready' alibi for use when stopped in a stolen car. The trial court properly exercised its discretion in admitting the evidence." (*Id*. at pp. 445-446.)

The court here did not propose admitting the evidence to show common plan, and the discussion below about whether Olesh's prior conduct constituted a pat alibi was to some extent a red herring. Olesh citing his impairment to ultimately reduce a malicious shooting to one that was only grossly negligent functioned, in a broad sense, as an alibi, but using his disability as a reason not to be pat-searched was not an alibi in any sense— just an attempt to avoid discovery. The point was that both instances could reasonably be viewed as falsely invoking impairment to get out of trouble. And while Olesh argues that the evidence would be admitted to prove "identity," that is not the case. It was ruled

43

admissible to rebut the credibility of any witnesses who suggested that he was severely enough impaired that he could not have committed the robbery as shown by testimony and the video.  Olesh himself no doubt hoped to raise reasonable doubt about whether he was the one seen in the video, but the purpose of admitting the prior use of impairment as an excuse was not to say that such conduct tended to show a common plan implicating him in the current robbery.

Rather, we find this case controlled by *People v. Millwee* (1998) 18 Cal.4th 96 (*Millwee*), where a capital defendant testified that, when reaching for a nonfunctioning gun at his parents' house, he mistakenly picked up a functioning, loaded one, and that it misfired, killing his mother, "as the result of a sudden 'jolt' in his leg." (*Id*. at pp. 111, 129.)  The trial court allowed admission of the defendant's testimony evidence from a separate, pending case in San Diego, where he had shot a man with the same gun two days later and given a similar excuse.  The evidence was given with a limiting instruction that it could be used only to evaluate the truth of the defendant's testimony, not as evidence of disposition or bad character.  (*Id*. at pp. 129-130 & fn. 12.)  Rejecting a claim of abused discretion under section 1101 due to dissimilarities in the shootings that made it improper to show common design or plan, the court reasoned:  "Contrary to what defendant seems to claim, the prosecution was not obligated to comply with the requirements for showing a common plan under . . . section 1101, subdivision (b), because the excerpts from [his] testimony in the San Diego case were not offered or admitted for that purpose.  The evidence was instead admitted, with an appropriate limiting instruction, for the far narrower purpose of showing the implausibility and untruthfulness of defendant's testimony in the capital case.  (See . . . § 1101, subd. (c) [nothing in the statute 'affects the admissibility of evidence offered to support or attack the credibility of a witness'].) [¶] Indeed, defendant's testimony in the San Diego case suggested that he was not a credible witness because of at least one critical discrepancy between the two accounts.  While defendant testified in San Diego that he had not fired the gun or known it was loaded prior to the shooting charged in that case, he admitted under oath in the capital case that he shot his mother with the same weapon in Riverside

two day earlier. Moreover, defendant sought to avoid responsibility for both shootings by offering the same innocent explanation in each case. He testified in each proceeding that he was thinking about selling the gun, that he was holding it oddly by the trigger and that a sudden distraction caused the gun to shift and discharge in the direction of an unintended victim. The jury could readily find that defendant's credibility in the present case was diminished by the fact that he offered the same explanation for another shooting that occurred only 48 hours later. In light of the foregoing, the evidence was not subject to exclusion under . . . section 1101." (*Millwee* at pp.130-131.)

Olesh distinguishes *Millwee*, but not meaningfully. It does not matter that his conduct in the shooting case did not involve any question of identity, whereas this one did. The evidence was not ruled admissible to show identity. Nor does it matter that it was the defendant himself who was impeached in *Millwee*, whereas Olesh would have presented doctors, whose testimony about his physical condition before the robbery would not have been impeached by Olesh misusing his impairment a year earlier. We have no record indication that Olesh actually secured the medical testimony his counsel spoke about at the in limine hearing. We do not know that he could have secured any medical testimony about his condition at or near the time of the robbery. Also, it looks as if his counsel had shifted gears by the time of the defense case, proposing instead to use lay witnesses, a friend and an employee who knew Olesh at or near the time of the robbery. The veracity of both would have been in issue. The veracity of the friend, Shields, was actually rejected at trial when he gave the alibi that Olesh was at the party when the robbery occurred. Further, Olesh overlooks the fact that the prior incidents, if found to be fabrications or exaggerations, would have tended to support the observations of Wilson and the officer who arrested Olesh.

Finally, Olesh tries but does not show abuse of discretion under section 352 in the ruling. We presume that the court would have given appropriate limiting instruction, as in *Millwee* (*Millwee*, *supra*, 18 Cal.4th at p. 131); nothing to the contrary appears from the discussions and ruling. The court also indicated on the record that would exercise its discretion under section 352 to forbid references to the charges and conviction in the first

45

incident, and the loaded gun in the second. This left nothing that we could call inflammatory or otherwise unduly prejudicial.

### E. *Cumulative Prejudice*

Olesh claims cumulative prejudice from the errors he has raised. However: " 'We have either rejected on the merits defendant's claims of [cognizable] error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236, quoting from *People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## IV. DISPOSITION

The judgment is affirmed.

_____
Haerle, Acting P.J.

We concur:

_____
Lambden, J.

_____
Richman, J.

46